**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| CVENT, INC., and ONE CLIPBOARD, LLC d/b/a Splash, | **REDACTED** |
| *Plaintiffs*, | Civ. No. ___1:25-cv-1341___ |
| v. | **JURY TRIAL DEMANDED** |
| JOYN EXPERIENCES, INC. d/b/a Zuddl, | |
| *Defendant*. | |

## COMPLAINT FOR MONETARY DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs Cvent, Inc., and One Clipboard, LLC d/b/a Splash (collectively, "Splash" or "Plaintiffs"), by their undersigned counsel, hereby bring this Complaint for damages and injunctive relief against Defendant Joyn Experiences, Inc. d/b/a Zuddl ("Zuddl" or "Defendant") and in support state as follows:

## NATURE OF THE ACTION

1.     In June 2025, Zuddl, a Splash competitor, infiltrated Splash's proprietary software platform with the help of a longstanding Splash customer, CrowdStrike, gaining a front-row seat to confidential Splash information that is otherwise only available to its licensed users.

2.     Splash is an established event management platform that has been in operation since 2012. Splash's unique design and feature compilation create a highly sought-after, seamless user experience. Today, Splash boasts nearly 800 customers, many of which are Fortune 1000 companies.

3.     Zuddl is a new entrant into the event management marketplace. Founded in 2020, Zuddl is a direct competitor to Splash for customers and market share. Zuddl actively markets

itself as a Splash alternative and dedicates an entire page of its website to comparing its product to Splash's.

4.      When an opportunity arose to gain behind-the-scenes access to Splash's platform through CrowdStrike, Zuddl seized the chance.  Splash has recently learned that—in violation of CrowdStrike's agreement with Splash—a CrowdStrike employee provided Zuddl with extensive, unauthorized access to Splash's confidential platform.  CrowdStrike not only provided Zuddl in-depth demonstrations of Splash's proprietary features, but it also created a fake user account for a Zuddl employee, thereby allowing Zuddl to review considerable portions of the platform.

5.       Zuddl willfully and maliciously circumvented Splash's access restrictions in order to misappropriate Splash's proprietary platform to develop its own system, compete with Splash, and poach its customers—including CrowdStrike, which ended its relationship with Splash once Zuddl had enough information to port over CrowdStrike's data to its own platform.

6.      Zuddl has ignored Splash's cease-and-desist letter, and—though Zuddl is undoubtedly aware of Splash's efforts to contact it to try to reach a resolution—Zuddl has not otherwise bothered to reach out to Splash.

7.      Accordingly, Splash brings this action to protect its business from imminent and irreparable harm resulting from Zuddl's ongoing and threatened misappropriation of Splash's trade secrets in violation of the federal Defend Trade Secrets Act and the Virginia Uniform Trade Secrets Act.  Splash also seeks compensatory damages arising out of Zuddl's computer fraud and computer trespass under the Virginia Computer Crimes Act, tortious interference with contract and business expectancy, and trespass to chattels.

## PARTIES

8.    One Clipboard, LLC d/b/a Splash is a Delaware corporation with its principal place of business in Tysons Corner, Virginia.  One Clipboard, LLC d/b/a Splash is wholly owned by Cvent, Inc., a Delaware corporation with its principal place of business in Tysons Corner, Virginia. Cvent, Inc. is a wholly owned subsidiary of Cvent Holding Corp.

9.    Upon information and belief, Zuddl is a Delaware corporation with a principal place of business in Oakley, California.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this case involves a federal question under the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836(b).  This Court has supplemental subject matter jurisdiction under 28 U.S.C. § 1367 over Splash's claims under the Virginia Uniform Trade Secrets Act, Va. Code § 59.1-336, *et seq.*, the Virginia Computer Crimes Act, Va. Code § 18.2-152.1, *et seq.*, Splash's tortious interference with business expectancy claim, and Splash's trespass to chattels claim.

11.    On information and belief, the Splash servers that Zuddl accessed without authorization were and are located in Loudon County, Virginia, which Zuddl knew or had reason to know.  These servers host the computers, computer networks, and computer systems that Zuddl accessed.

12.    This Court has personal jurisdiction over Zuddl under the Virginia Long Arm Statute, Va. Code § 8.01-328.1, and the Due Process Clause of the Fourteenth Amendment of the United States Constitution.  Zuddl caused tortious injury by committing an act in Virginia, and purposefully availed itself of this Court's jurisdiction by deliberately using Virginia instrumentalities—Splash's computer systems, data, and servers—when it accessed Splash's

platform.  Pursuant to Virginia's long-arm statute, Va. Code § 8.01-328.1, using a computer or computer network located in Virginia constitutes an act in Virginia.  Zuddl is therefore subject to personal jurisdiction in Virginia because it: (a) caused tortious injury to Splash in Virginia by the act of using a computer or computer network located in Virginia, which gave rise to the causes of action herein, and (b) caused tortious injury in Virginia by an act or omission outside Virginia while, upon information and belief, regularly conducting or soliciting business and deriving substantial revenue from Virginia.

13.    This Court also has personal jurisdiction over Zuddl because Zuddl committed an intentional tort aimed at Splash's computer systems in Virginia, Splash felt the brunt of the harm in Virgina, and Zuddl expressly aimed its tortious conduct at Splash in Virginia such that Virginia was the focal point of the tortious activity, which Zuddl knew or should have known when it accessed Splash's computer systems, data, and servers.

14.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because the computer systems and servers that Zuddl accessed, giving rise to this action, are located in the Eastern District of Virginia, which Zuddl knew or reasonably should have expected when making contacts with Splash's computer systems and servers.  Venue is also proper in this District under 28 U.S.C. § 1391(c) because Zuddl is subject to personal jurisdiction here.

## **FACTUAL ALLEGATIONS**

### **A. Splash Provides a Market-Leading Event Management Platform to Hundreds of Corporate Customers**

15.    Splash is an event management software company that provides intuitive event management and marketing tools in a cohesive platform, enabling customers to efficiently and seamlessly create and manage events.  Splash also provides event-based data collection and analytics, which allow its customers to gain invaluable insights into their event attendees,

participation, and outcomes.  Rather than relying on manual processes, Splash customers can automate tasks and streamline processes to create events, engage with attendees, capture sales leads, and track ROI from events.

16.     Splash was founded in 2011 and launched its platform in 2012.  Since its launch, Splash has invested substantial resources into continually refining its platform to incorporate new information learned from both market research as well as thirteen years of hands-on experience onboarding, assisting, and speaking with its own customers.  Splash also periodically conducts rigorous post-event analyses to assess the effectiveness of its various features, and uses those findings to further develop its platform to better target its customers' needs.  For example, each year, Splash analyzes high-performing events to assess what factors contribute to high guest turnout.

17.     In 2024, Cvent Holding Corp., an industry-leading cloud-based platform of event marketing and management and hospitality solutions, acquired Splash for ███████████.  Cvent acquired Splash because of, among other features, the unique opportunities presented by Splash's platform in the growing product category of repeatable events, and has continued to invest significant resources into Splash since the acquisition.

18.     As a further testament to its value, Splash customers typically spend tens or hundreds of thousands of dollars a year to license Splash's proprietary platform because Splash uniquely integrates brand design, scalability, and ease of use into one platform.  Though its competitors may offer similar features in isolation, Splash differentiates itself by integrating these elements to deliver a seamless experience.  For its part, at the time its contract with Splash expired at the end of June 2025, CrowdStrike was paying ██████ annually for access to Splash's platform.

19.     In fact, at the time of its acquisition, Splash boasted over 500 customers, 60 of which were Fortune 1000 companies.  The successes of Splash's customers further illustrate its value:

- Expedia Group reports saving 60 hours per event it hosts with Splash, and hosts over 1,000 events each year;

- Sharp hosted over 100 events across 56 branches in its first year with Splash;

- gumgum reports that its sales pipeline from event attendees tripled and its revenue from event attendees doubled because of its use of the Splash platform; and

- Avetta reports a 75% decrease in event set up time.

These success stories reflect Splash's reputation as the gold standard of event management software in the industry.

### B. Splash Limits Access to Its Platform to Licensed Users Who Agree to Keep Splash's Platform Confidential, and Restricts Access to Registered Users with Passwords

20.     Splash restricts access to its proprietary, non-public platform to its licensed customers who sign confidentiality agreements before they are provided access to Splash's platform.  Likewise, Splash employees are required to sign confidentiality agreements as a condition of their employment.

21.     CrowdStrike's June 2020 Master Services Agreement ("MSA") with Splash contains Splash's standard confidentiality clause:

> All non-public information, including the terms of this Agreement and any SOW, pricing, programs, brochures, reports, technical information, non-technical information, mailing lists, and other such information of any nature made available to either Party by the other Party, by virtue of the association hereunder, including, but not limited to information relating to the Servies or the Platform and the ideas, technology, techniques, process and procedures constituting the Servies or the Platform, or relating to the use of the Services or the Platform and any information disclosed by Splash, in whatever form, that relates to the Services of the Platform (collectively,

the "Confidential Information") shall be held in strict confidence and neither Party shall disclose any such Confidential Information to any other person or party without the written consent of the other Party.

22.     Section 6.4 of the MSA further provides:

[CrowdStrike] shall not reverse engineer any Service or the Platform, or disassemble, decompile, or otherwise apply any procedure or process in order to ascertain, derive, and/or appropriate for any reason or purpose, the source code for same or other software provided or made available for use and/or access under this Agreement, or any algorithm, process, procedure or trade secret information contained in the Services provided by Splash.

23.     Section 6.5 of the MSA further provides that CrowdStrike "shall not copy or otherwise reproduce any software, any part or component of the Platform or the Services provided by Splash hereunder."

24.     In addition, Section 6.1 of the MSA provides that Splash is the sole owner of its intellectual property:

The Parties agree that Splash shall retain and own all proprietary rights in and to (i) its business, (ii) any data provided by Splash to Client, (iii) Splash's intellectual property (iv) all data and materials owned by Splash (v) the Services, and (v) the Platform, including all software, source code, modifications, updates and enhancements thereof or any other aspect of the Services or Platform.

25.     Furthermore, only licensed, registered individual users with usernames and passwords may access the Splash platform.  Registered users must be invited to the platform by Splash's customers' system administrators.

26.     Indeed, Splash endeavors to keep its platform confidential because it is highly valuable.  Splash would never knowingly allow its competitors access to the full platform:   if Splash's competitors had access to Splash's proprietary software, they could profit from Splash's many years of research, analysis, and product development to replicate Splash's design and architecture more efficiently and at less cost.

**C. Zuddl Enters the Market, Touts Itself as a Competitor to Splash, and Infiltrates Splash's Platform Through a Licensed Customer's Account**

27.     Zuddl entered the market in 2020.  Since its launch, Zuddl has touted itself as a Splash alternative, even dedicating an entire page on its website to comparing itself to Splash:



Screenshot from https://www.zuddl.com/compare/splash (accessed July 25, 2025).

28.     In or about June 2025, CrowdStrike—in breach of the MSA—gave Zuddl extensive, unauthorized access to Splash's platform.

29.     CrowdStrike has been a Splash customer since July 2020.  In May 2025, Splash and CrowdStrike began negotiating a renewal of the MSA, which was set to expire at the end of June.  Unbeknownst to Splash, CrowdStrike was simultaneously in talks with Zuddl about moving its Splash business there.

30.     Contract renewal negotiations continued through June 2025.  Finally, on June 25, CrowdStrike informed Splash that it would not renew its agreement with Splash under the terms

the parties had operated under for years.  Instead, CrowdStrike asked Splash to reduce its number

of paid user licenses from 117 to just 13; Splash declined to renew the agreement on those terms.

31.     CrowdStrike's unexpected request to dramatically drop its number of paid user

licenses raised concern within Splash.  Upon investigating CrowdStrike's account, Splash learned

that CrowdStrike had created event pages with "Zuddl" in the name and privacy gated with the

password "zuddl1teamdem08!"   This discovery prompted Splash to further investigate

CrowdStrike's user activity.

32.     Splash's investigation revealed that while contract renewal talks were ongoing,

apparently hoping that Zuddl could replicate Splash's unique and proprietary features,

CrowdStrike—in breach of the MSA—invited a Zuddl employee to CrowdStrike's Splash account,

giving the Zuddl employee access and the ability to view the full Splash platform firsthand.

Specifically, on June 17, 2025, CrowdStrike's Manager of Marketing Technology Teddy Babanao,

using one of CrowdStrike's licenses, invited a new user with the email "raj@zuddl.com" to

CrowdStrike's Splash account.  Within one minute of inviting "raj@zuddl.com" to CrowdStrike's

account—no doubt realizing that a competitor's email address would raise red flags within

Splash—Mr. Babanao deleted the "raj@zuddl.com" invitation from the CrowdStrike account and

replaced it with the user "bubby.raj@gmail.com," in a clear attempt to conceal the identity of the

user.  The "bubby.raj@gmail.com" account was a view-only account that allowed the user to view

the entirety of the Splash platform but not make changes.

33.     By giving a Zuddl employee full access to the Splash platform, CrowdStrike

breached the MSA, which expressly prohibits CrowdStrike from sharing with "any other person

or party without the written consent of" Splash all "non-public information, including . . .

information relating to the Servies or the Platform and the ideas, technology, techniques, process

and procedures constituting the Servies or the Platform, or relating to the use of the Services or the Platform and any information disclosed by Splash, in whatever form, that relates to the Services of the Platform."

34.     Zuddl's access did not stop there.  Splash's investigation also revealed that, at the same time that the Zuddl employee logged in to Splash, CrowdStrike also began providing behind-the-scenes demonstrations of Splash's proprietary design and feature compilations to Zuddl. Specifically, CrowdStrike provided lengthy demonstrations to Splash on June 17 and June 18, 2025.  In hindsight, it is clear that CrowdStrike asked to retain just 13 paid Splash licenses to facilitate the transition of its data to Zuddl.

35.     Through its investigation, Splash also discovered that CrowdStrike appears to have prepared page and event demonstrations for Zuddl as early as March 2025.  It is not clear when Zuddl first viewed those demonstrations or otherwise gained unauthorized user access prior to June 17, 2025.

36.     Zuddl's access to Splash's proprietary information continued over the following days and weeks, until Splash discovered the intrusion on June 25, 2025, and took immediate action to restrict Zuddl's ability to further access Splash's proprietary systems.  As described further in the pages that follow:

- On June 17, Mr. Babanao from CrowdStrike provided a nearly hour-long demonstration of several Splash features, showcasing how the Splash platform uniquely integrates tools such ███████████████████████████ ██████████████████████████████████████ ████████████████████████████. Mr. Babanao also invited "Raj" from Zuddl to the CrowdStrike Splash account during this demonstration,

and "Raj" accepted the invitation, thereby giving Zuddl full access to view Splash's design and features.

- At the same time, "Raj" from Zuddl logged in to the Splash platform and perused various features.

- On June 18, 2025, CrowdStrike provided Zuddl with further demonstrations of key features of the Splash platform in a 40+ minute tour, zeroing in on the Event page in Splash's platform ██████████████████████████████████████ ████████████████████████████████████████████████████████████. CrowdStrike also highlighted Splash's Event Privacy page ███████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████ Finally, CrowdStrike demonstrated Splash's Event Settings page to Zuddl ████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ███████████

- Also on June 18, 2025, Zuddl directly accessed Splash's platform through its CrowdStrike user account, viewing the My Events page.

- On June 25, 2025, Zuddl again accessed Splash's platform through its CrowdStrike user account, viewing the My Events page again.

- On June 30, 2025, Zuddl attempted to access Splash's platform three separate times. However, Splash had discovered the incursion and deactivated the Zuddl user account, so Zuddl's log in attempts were unsuccessful.

**D. On June 17, 18, and 25, Zuddl Accessed the Splash Platform**

37.     As previewed above, on June 17, June 18, and June 25, without authorization, Zuddl viewed and accessed the highly valuable, confidential design elements of the Splash platform—experiencing for itself both Splash's look and feel as well as its system architecture, which combines Splash's features into an efficient, seamless user experience.  CrowdStrike's demonstrations and Zuddl's unauthorized access focused in particular on several proprietary elements: its integrated platform, pre-built templates for scalability, brand differentiation by design, and efficiency and ease of use.

<u>My Events Page Demonstration</u>

38.     Beginning on June 17, 2025, Mr. Babanao provided Zuddl with a 47-minute-long demonstration of the Splash system, beginning with Splash's My Events page.

39.     The My Events dashboard is an example of Splash's proprietary design, ███████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████ .

40.     Mr. Babanao first demonstrated to Zuddl the ██████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████.

41.    ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████.

42.    After showing Zuddl the home page, Mr. Babanao navigated back to the My Events page and opened the Event Filters function, █████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████.

43.    ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████, Zuddl gained

an otherwise-inaccessible understanding of a valuable, proprietary component of Splash's

platform.

Library Page Demonstration

44.    Next, Mr. Babanao opened the Library page ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████

45.    Mr. Babanao's demonstration of the Library page gave Zuddl access to another

proprietary element of Splash's design: its pre-built templates for ease of use and scalability.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████



46. ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████.

47.     By gaining first-hand access to Splash's Library page, Zuddl was able to view and

learn how Splash implements its ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

<u>Team Page Demonstration</u>

48.     Next, Mr. Babanao navigated to the Team page ████████████████████████

████████████████████████████████ On this page, Mr. Babanao first demonstrated the layout,

and then added raj@zuddl.com as a user to the CrowdStrike account. ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████ By adding bubby.raj@gmail.com to the CrowdStrike account,

Mr. Babanao gave Zuddl the ability to view the entire Splash platform.

49.     At this point, Raj accepted the invitation to join CrowdStrike's account and

explored the platform, █████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ for a few minutes while Mr. Babanao continued the

demonstration.

<u>Confirmations Page Demonstration</u>

50.     Mr. Babanao navigated back to the My Events page, opened another event, and

opened the Confirmations page for that event. ██████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Mr. Babanao showed Zuddl a specific

event's configured Confirmations page, █████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████

51.    ██████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████ Again, the tour of

this portion of the Splash platform allowed Zuddl to view Splash's otherwise confidential and

proprietary page design.

<u>Event Design Page Demonstration, Including Blocks Feature</u>

52.    Mr. Babanao logged onto the Splash platform again on June 18, 2025, in another

apparent demonstration to Zuddl of its features and layout.  During this 40+ minute session, Mr.

Babanao focused on features within specific, already-created event pages.  He began by opening

a pre-created event and opening the event page design screen.

53.    ███████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████████████████████ Mr. Babanao spent more

than 20 minutes on this page, ██████████████████████████████

████████████████████████████

17

54. 

55.

56.

57.    ████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████

58.    Mr. Babanao's lengthy demonstration of the event design page, ████████,

gave Zuddl access to another one of Splash's highly valuable and proprietary features.

<u>Event Privacy, Integrations, and Settings Pages Demonstration</u>

59.    After this, Mr. Babanao switched to a different, pre-created event and navigated to

the Event Privacy page. ████████████████████████

████████████████████████████████████

████████████████████████████████ Mr. Babanao spent

approximately 20 minutes on the Event Privacy page, allowing Zuddl to see exactly how Splash

organizes its page for customer ease of use and brand compliance purposes.

60.    Mr. Babanao then opened another event and navigated to the Event Integration page

inside the event settings. ████████████████████████████



61.    Mr. Babanao then opened another event and navigated to the Event Settings page.

62.     Following Mr. Babanao's two initial, lengthy demonstrations of the Splash platform, Zuddl's "Raj" accessed the Splash platform twice more, directly through its user account. On both June 18 and June 25, Raj explored Splash's My Events page again, viewing its layout, key features, and other elements of design impacting user experience.

63.     The features that Zuddl accessed and viewed—including the Splash platform's event types and seamless third-party integrations, pre-built templates for scalability and consistency, its brand differentiation by design, and efficiency and ease of use—make the Splash platform highly desirable to its customers and competitive in the market. Zuddl's insight and access into the platform allows Zuddl to replicate the Splash platform's design and architecture and otherwise develop its platform and business strategy to compete with Splash. And without question, Zuddl's access to the platform also allowed it to poach CrowdStrike from Splash: CrowdStrike now uses Zuddl for the same or substantially similar services for which it used Splash.

**E.  CrowdStrike and Zuddl Failed to Respond to Splash's Repeated Requests for Key Information About the Breach**

64.     On June 26, 2025, Splash, through undersigned counsel, sent to Zuddl's co-founders Bharath Varma and Vedha Sayyaparaju through both email and Federal Express a letter directing Zuddl to cease-and-desist from using the information it obtained during its unauthorized access to the Splash platform. The letter noted that Zuddl's conduct violates at least two provisions of the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, and that Zuddl's conduct represents a "direct and immediate threat to Cvent's business."

65.     In the letter, Splash demanded that Zuddl "cease and desist all attempts to access the Splash Platform" and asked Zuddl to identify "all instances where Zuddl (or any representative thereof) has accessed or viewed the Splash Platform, including (i) the date of access, (ii) the

identities of any individuals who accessed the Splash Platform, and (iii) a description of all sites accessed." Splash further requested Zuddl to certify that it would "immediately refrain from viewing or accessing or attempting to view or access the Splash Platform" and not "use, consult, rely on, or disseminate (whether internally or to any third party)" any Splash information.

66.    To date, Zuddl has not responded to Splash's cease-and-desist letter or otherwise corresponded with Splash or Cvent since this dispute arose.

67.    Also on June 26, Splash, through undersigned counsel, sent a cease-and-desist letter to CrowdStrike.

68.    CrowdStrike responded to Splash's June 26 cease-and-desist letter in an unsigned letter from "CrowdStrike Legal" on June 30. CrowdStrike confirmed that it provided Zuddl with "view-only" access to the Splash platform, including viewer access to information and materials belonging to Splash, and that Zuddl's access had been "revoked." (It was revoked by Splash). CrowdStrike's June 30 letter disclosed that it had instructed Zuddl to "refrain from use of any information or materials it may have accessed belonging to Splash," that it was actively investigating the matter, and that it was preserving relevant materials.

69.    On July 11, 2025, CrowdStrike sent Splash a second (also unsigned) letter, in which it further conceded that: (a) a CrowdStrike employee had granted Zuddl unauthorized access (b) CrowdStrike was subject to restrictions prohibiting such access, and (c) that the CrowdStrike employee who granted Zuddl access acted "without authorization." CrowdStrike informed Splash that the employee had been "counseled and instructed not to repeat this conduct," and reiterated that Zuddl's access had been "revoked."

70.    On July 22, 2025, Splash, through undersigned counsel, responded to CrowdStrike's July 11 letter. Splash noted that the July 11 letter failed to address key questions

about the unauthorized access, including: identifying "instances where Zuddl (or any representative thereof) has accessed or viewed the Splash Platform, including (i) the date of access, (ii) the identities of any individuals who accessed the Splash Platform, and (iii) a description of all sites accessed;" providing any communications between CrowdStrike and Zuddl; or providing screenshots of the information accessed. Splash reiterated its request for additional information from CrowdStrike addressing "the basic facts underlying the breach event" so that Splash could fully assess its risk and determine appropriate next steps.   Splash also pointed out various inconsistencies and inaccuracies in CrowdStrike's correspondence.

71.    On August 4, 2025, CrowdStrike responded to Splash's July 22 correspondence, insisting that Zuddl's access was "brief," limited to "approximately 30 minutes," and was made for the "sole purpose of viewing landing pages and registration confirmation emails" to assist in "supporting a system migration."   These characterizations directly contradict the findings of Splash's investigation detailed above, which shows not only direct access by Zuddl on June 17, June 18, and June 25, but hours—not minutes—of detailed demonstrations by CrowdStrike of Splash's proprietary platform.  Furthermore, Zuddl accessed far more information than necessary for a "system migration."

72.    CrowdStrike's lack of transparency about the true scope of Zuddl's access and continued refusal to provide key information about what Zuddl accessed—coupled with Zuddl's refusal to respond entirely—leaves Splash with no choice but to seek this Court's assistance protecting its trade secrets from further misappropriation by Zuddl.

**COUNT I**
**Misappropriation of Trade Secrets –**
**Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.***

73.     Splash incorporates and restates all previous allegations as if fully set forth herein.

74.     Splash markets and sells its platform to users in different states, and thereby its products or service are used, or intended for use, in interstate commerce.

75.     Splash's platform is a trade secret.  Splash undertakes reasonable efforts to maintain the secrecy of its platform, including by requiring all licensed customers to sign confidentiality agreements.

76.     The platform's event types and seamless third-party integrations, pre-built templates for scalability and consistency, its brand differentiation by design, and efficiency and ease of use make its platform highly desirable to its customers and competitive in the market.  With access to the Splash platform, Splash's competitors could replicate the Splash platform, including the design, workflow, and functionality, or otherwise develop their own platforms to compete with Splash.

77.     The Splash platform thus derives independent economic value because it is not generally known and not readily ascertainable by another person who could gain economic value from its disclosure or use.

78.     Zuddl willfully and maliciously misappropriated the Splash platform by accessing the Splash platform without authorization.

79.     Zuddl acquired information about the Splash platform through improper means, i.e., by gaining unauthorized access to Splash's platform in violation of CrowdStrike's agreement with Splash and by attempting to conceal its identity.

80.     When Zuddl acquired information about the Splash platform, it knew or had reason to know that its knowledge thereof was derived from or through a person (i.e., CrowdStrike) who owed a duty to Splash to maintain the secrecy or limit the use of the trade secret.

81.     Zuddl used the Splash platform without express or implied consent, and at the time of its use, knew or had reason to know that knowledge of the Splash platform was acquired under circumstances giving rise to a duty to maintain the secrecy of the Splash platform.

82.     Zuddl misappropriated the Splash platform for its own economic benefit.

83.     Splash has suffered, and will continue to suffer, pecuniary harm as a direct and proximate result of Zuddl's misappropriation of Splash platform.

84.     Zuddl was unjustly enriched by its misappropriation of the Splash platform because its misappropriation allowed it to take CrowdStrike's business away from Splash.

85.     Splash seeks injunctive relief to prevent Zuddl from further use of the Splash platform.

**<u>COUNT II</u>**
**Misappropriation of Trade Secrets –**
**Virginia Uniform Trade Secrets Act, Va. Code § 59.1-336, *et seq.***

86.     Splash incorporates and restates all previous allegations as if fully set forth herein.

87.     Splash owns the Splash platform, which is a trade secret not available to the public.

88.     Splash undertakes reasonable efforts to maintain the secrecy of its platform, including by requiring all licensed customers to sign confidentiality agreements.

89.     The platform's event types and seamless third-party integrations, pre-built templates for scalability and consistency, its brand differentiation by design, and efficiency and ease of use make its platform highly desirable to its customers and competitive in the market.  With access to the Splash platform, Splash's competitors could replicate the Splash platform, including

the design, workflow, and functionality, or otherwise develop their own platforms to compete with Splash.

90.     The Splash platform thus derives independent economic value because it is not generally known and not readily ascertainable by another person who could gain economic value from its disclosure or use.

91.     Zuddl willfully and maliciously misappropriated the Splash platform by accessing the Splash platform without authorization.

92.     Zuddl acquired information about the Splash platform through improper means, i.e., by gaining unauthorized access to Splash's platform in violation of CrowdStrike's agreement with Splash and by attempting to conceal its identity.

93.     When Zuddl acquired information about the Splash platform, it knew or had reason to know that its knowledge thereof was derived from or through a person (i.e., CrowdStrike) who owed a duty to Splash to maintain the secrecy or limit the use of the trade secret.

94.     Zuddl used the Splash platform without express or implied consent, and at the time of its use, knew or had reason to know that knowledge of the Splash platform was acquired under circumstances giving rise to a duty to maintain the secrecy of the Splash platform.

95.     Zuddl misappropriated the Splash platform for its own economic benefit.

96.     Splash has suffered, and will continue to suffer, pecuniary harm as a direct and proximate result of Zuddl's misappropriation of Splash platform.

97.     Zuddl was unjustly enriched by its misappropriation of the Splash platform because its misappropriation allowed it to take CrowdStrike's business away from Splash.

98.     Splash seeks injunctive relief to prevent Zuddl from further use of the Splash platform.

## COUNT III
### Computer Fraud –
### Virginia Computer Crimes Act, Va. Code § 18.2-152.1, *et seq.*

99.     Splash incorporates and restates all previous allegations as if fully set forth herein.

100.    In connection with its regular business operations, including the provision of online and internet-based services to customers in Virginia and other states, upon information and belief, Splash maintains in Virginia computers and computer networks, including affected servers, as those terms are defined in Va. Code § 18.2-152.2.

101.    Zuddl repeatedly and with malicious intent, and without authorization, used Splash's computers or computer networks when it accessed Splash's platform on June 17, June 18, and June 25, 2025.

102.    During each of its access sessions on June 17, June 18, and June 25, Zuddl obtained property—computer data, programs, or software, including representations of information that Splash prepared and processed on its computers or computer networks—by false pretenses. Specifically, Zuddl intentionally used a secret user account with username "bubby.raj@gmail.com" name rather than a Zuddl email address to conceal Zuddl's account and secretly access the Splash platform.

103.    The foregoing acts of Zuddl injured Splash and have caused damage to Splash's reputation and business relationships, including lost revenue, profits, the costs of this suit, and at least one customer relationship.  Splash's damages shall be proven at trial.

## COUNT IV
### Computer Trespass –
### Virginia Computer Crimes Act, Va. Code § 18.2-152.1, *et seq.*

104.    Splash incorporates and restates all previous allegations as if fully set forth herein.

105.    In connection with its regular business operations, including the provision of internet-based services to customers in Virginia and other states, upon information and belief, Splash maintains in Virginia computers and computer networks, including affected servers, as well as computer data, software, or programs that are "property" within the meaning of Va. Code § 18.2-152.2.

106.    Zuddl knowingly, with malicious intent and through intentionally deceptive means, acted without Splash's authority when accessing the Splash platform through a secret user account created by CrowdStrike and with a username intended to conceal Zuddl's identity.  Zuddl had no authorization, right, agreement, or permission to use or access the Splash platform.

107.    Without authority, Zuddl repeatedly and with malicious intent gained unauthorized access to Splash's computer systems and data with the intent to obtain an unauthorized copy of Splash's computer data, programs, or software residing in, communicated by, or produced by Splash's computer or computer network under false pretenses by using a secret user account created by former Splash customer CrowdStrike to access the Splash platform in order to misappropriate and recreate Splash's proprietary platform to improve and further develop Zuddl's platform and increase its sales, including to former Splash customer CrowdStrike.  Zuddl has had access to the Splash platform from at least June 17, 2025, to June 25, 2025, when the unauthorized access was identified by Splash.  The timing and frequency of Zuddl's unauthorized access suggest that Zuddl had promised to recreate proprietary portions of Splash's platform for its customers, including CrowdStrike.

108.    Upon information and belief, without authority, Zuddl has repeatedly and with malicious intent gained unauthorized access to Splash's computer systems and data in order to use Splash's computers and computer network, including its Virginia-based servers, to make or cause

to be made unauthorized copies of Splash's platform, or elements thereof, residing in, communicated by, or produced by Splash's computer system via the Splash platform. Upon information and belief, Zuddl copied and integrated proprietary elements of the Splash platform— including its design and architecture—into its own platform and as part of Zuddl's sale of its platform to third parties, including CrowdStrike.

109. The foregoing acts of Zuddl injured Splash and have caused damage to Splash's reputation and business relationships, including lost revenue, profits, the costs of this suit, and at least one customer relationship. Splash's damages shall be proven at trial.

## COUNT IV
### Tortious Interference with Contract

110. Splash incorporates and restates all previous allegations as if fully set forth herein.

111. The MSA between CrowdStrike and Splash prohibits CrowdStrike from disclosing (MSA § 6.3), reverse engineering (MSA § 6.4), or copying (MSA § 6.5) the Splash platform or any component thereof, which Zuddl knew.

112. Zuddl intentionally caused CrowdStrike to breach the above-referenced provisions of the MSA by enlisting CrowdStrike to gain unauthorized access to the Splash platform. Specifically, CrowdStrike breached the MSA by disclosing the Splash platform to Zuddl and, on information and belief, working with CrowdStrike to reverse engineer and copy the Splash platform or components thereof.

113. Zuddl's interference was improper because it was deceptive and unlawful.

114. Zuddl's interference has caused Splash to suffer damages in an amount to be proven at trial.

## COUNT V
## Tortious Interference with Business Expectancy

115.    Splash incorporates and restates all previous allegations as if fully set forth herein.

116.    Splash had an ongoing business relationship with and contract with CrowdStrike and reasonably expected to renew its contract with CrowdStrike on the parties' previous terms.

117.    Zuddl was aware that Splash had an ongoing business relationship with CrowdStrike.

118.    Zuddl intentionally interfered with Splash's business expectancy by accessing the Splash platform without authorization, which allowed it to take Splash's CrowdStrike business.

119.    Zuddl's interference was improper because it was deceptive and unlawful.

120.    Zuddl's interference with Splash's business expectancy has caused Splash to suffer damages in the amount of lost revenue from CrowdStrike, to be proven at trial.

## COUNT VI
## Trespass to Chattels

121.    Splash incorporates and restates all previous allegations as if fully set forth herein.

122.    Zuddl repeatedly and intentionally gained unauthorized access to Splash's platform on servers located, upon information and belief, in Virginia.  In doing so, Zuddl engaged in improper, unauthorized intrusion into Splash's computer systems and servers.

123.    The Splash platform constitutes Splash property. Zuddl intentionally used and intermeddled with the Splash platform when it accessed the Splash platform without authorization, and, upon information and belief, Zuddl converted elements of the platform's design and architecture for its own use.

124.    Zuddl's unauthorized access diminished the value of the Splash platform because it deprived Splash of significant revenue/profits from CrowdStrike and deprived Splash of the ability to sell its platform to CrowdStrike.

125.    Zuddl's actions have injured Splash and imposed costs on Splash, including time, money, reputation, and burden on Splash's computer systems.  As a result of Zuddl's unauthorized and intentional conduct, Splash has been damaged in an amount to be proven at trial.

126.    Zuddl's acts of trespass have been undertaken intentionally with malice, oppression, and fraud, justifying imposition of punitive damages in an amount sufficient to punish Zuddl and deter Zuddl and others from engaging in similar conduct.

## PRAYER FOR RELIEF

WHEREFORE, Splash prays for judgment against Zuddl, and as relief therefore, respectfully requests:

A.  Judgment in favor of Splash and against Zuddl;

B.  A Temporary Restraining Order and preliminary and permanent injunction ordering Zuddl and its agents, affiliates, employees, and those persons in active concert or participation with Zuddl, including CrowdStrike, not to use, review, copy, disclose, reveal, or profit from any information pertaining to the Splash platform;

C.  A permanent injunction ordering Zuddl to return all tangible items related to the Splash platform and permanently delete and destroy all electronic items related to the Splash platform;

D.  An award of compensatory damages for Splash's actual loss in an amount to be proven at trial;

E.  An award of unjust enrichment damages caused by Zuddl's misappropriation of Splash's trade secrets that is not addressed in computing damages for actual loss;

F.  In lieu of damages for unjust enrichment and actual loss caused by Zuddl's misappropriation of Splash's trade secrets, damages in the amount of reasonable royalties from Zuddl's use of Splash's trade secrets;

G.  An award of punitive damages in an amount sufficient to punish Zuddl and deter Zuddl and others from engaging in similar conduct;

H.  An award of attorneys' fees and litigation costs;

I.  Pre- and post-judgment interest; and

J.  Such other relief as the Court deems just and appropriate.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a jury trial for all claims so triable.


Dated: August 12, 2025                    Respectfully submitted,

                                          AEGIS LAW GROUP LLP


                                          /s/_____
                                          Serine Consolino (Va. Bar No. 95481)
                                          Ann Rakestraw (*pro hac vice* pending)
                                          Rachel E. Mueller (*pro hac vice* pending)
                                          801 Pennsylvania Avenue N.W., Suite 740
                                          Washington, D.C. 20004
                                          Tel.: 202-737-3500
                                          sconsolino@aegislawgroup.com
                                          arakestraw@aegislawgroup.com
                                          rmueller@aegislawgroup.com


                                          *Counsel for Plaintiffs Cvent, Inc., and One Clipboard, LLC d/b/a Splash*