CVENT, INC., and
ONE CLIPBOARD, LLC d/b/a Splash,

*Plaintiffs*,

v.

JOYN EXPERIENCES, INC. d/b/a Zuddl,

*Defendant*.

**REDACTED**

Civ. No. 1:25-cv-1341

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiffs Cvent, Inc., and One Clipboard, Inc. d/b/a Splash (collectively, "Splash" or "Plaintiffs"), by their undersigned counsel, bring this Motion for a Temporary Restraining Order and Preliminary Injunction against Defendant Joyn Experiences, Inc. d/b/a Zuddl ("Zuddl" or "Defendant").

## I. INTRODUCTION

This Court should temporarily restrain and preliminarily enjoin Zuddl's continued misappropriation of Splash trade secrets—namely, Splash's proprietary, non-public software platform which is only available to its licensed users. Splash has recently discovered that Zuddl has used a fake user account to gain unauthorized access to Splash's confidential platform.

Splash is an established event management platform founded in 2012. Its platform is the product of years of market research, customer insights, and rigorous analytics, and its unique design and feature compilation create a highly sought-after, seamless user experience.

By contrast, Zuddl is a new entrant into the event management marketplace. Founded in 2020, Zuddl touts itself as a Splash alternative and even dedicates an entire page of its website comparing its product to Splash:



*Screenshot from https://www.zuddl.com/compare/splash (accessed July 25, 2025).*

As a result, when presented with a chance to gain behind-the-scenes access to the Splash platform through CrowdStrike, a longstanding Splash customer, Zuddl seized the opportunity. In violation of CrowdStrike's agreement with Splash, a CrowdStrike employee provided Zuddl with extensive, unauthorized access to Splash's confidential platform. CrowdStrike not only provided Zuddl with hours of demonstrations of Splash's proprietary features, but it also created an unauthorized user account for Zuddl, which it attempted—but failed—to disguise. Zuddl was thus able to view the proprietary platform design and feature compilations that give Splash its competitive edge. Zuddl has ignored Splash's cease-and-desist letter, and—though Zuddl is undoubtedly aware of Splash's efforts to contact Zuddl to try to reach a resolution—Zuddl has not otherwise bothered to reach out to Splash.

## II. FACTUAL BACKGROUND

**A.    Splash Provides a Market-Leading Event Management Platform to Hundreds of Corporate Customers**

Splash is an event management software company that provides intuitive event management and marketing tools in a cohesive platform, enabling customers to efficiently and seamlessly create and manage events.   Declaration of Tetyana Zugyer ("Zugyer Decl.") ¶ 3. Splash also offers event-based data collection and analytics, which allow its customers to gain invaluable insights into their event attendees, participation, and outcomes. *Id.* ¶ 9; 10.  Rather than relying on manual processes, Splash customers can automate tasks and streamline processes to create events, engage with attendees, capture sales leads, and track ROI from events. *Id.* ¶ 3.

Since its launch over a decade ago, Splash has invested substantial resources to continually refining its platform-—including its pre-built templates, themes, blocks, and other features—to incorporate new information learned from both market research and years of hands-on experience onboarding, assisting, and speaking with customers.  Zugyer Decl. ¶ 32.  Splash also periodically conducts rigorous post-event analyses to assess the effectiveness of its various features and uses those findings to further refine its platform to better target its customers' needs.  *Id.*  In 2024, Cvent Holdings Corp. ("Cvent"), an industry-leading cloud-based platform of event marketing and management and hospitality solutions, acquired Splash for ▮▮▮▮▮▮▮.  Cvent acquired Splash because of, among other features, the unique opportunities presented by Splash's platform in the growing product category of repeatable events, and has continued to invest significant resources into Splash since the acquisition.  Today, Splash boasts nearly 800 customers, many of which are Fortune 1000 companies.

As a further testament to its value, Splash customers typically spend tens or hundreds of thousands of dollars a year to license Splash's proprietary platform because Splash uniquely

integrates brand design, scalability, and ease of use into one platform. Zugyer Decl. ¶ 7. Though its competitors may offer similar features in isolation, Splash differentiates itself by integrating these elements to deliver a seamless experience. *Id.* For its part, at the time its contract with Splash expired at the end of June 2025, CrowdStrike was paying ███ annually for access to Splash's platform. *See* Declaration of Katherine Rolfe ("Rolfe Decl.") ¶ 7.

The successes of Splash's customers further illustrate its value:

- Expedia Group reports saving 60 hours per event it hosts with Splash, and hosts over 1,000 events each year;

- Sharp hosted over 100 events across 56 branches in its first year with Splash;

- gumgum reports that its sales pipeline from event attendees tripled and its revenue from event attendees doubled because of its use of the Splash platform; and

- Avetta reports a 75% decrease in event set up time.

*See* https://splashthat.com/customers. These success stories reflect Splash's immense value to its customers and reputation as the gold standard of event management software in the industry.

## B. Splash Restricts Access to Licensed Customers Who Sign Confidentiality Agreements

To protect its market share, Splash restricts access to its proprietary, non-public platform to its licensed customers who sign confidentiality agreements before they are provided access to Splash's platform. Zugyer Decl. ¶ 5. Likewise, Splash employees are required to sign confidentiality agreements as a condition of their employment. *Id.* ¶ 5. As an example, CrowdStrike's June 2020 Master Services Agreement ("MSA") with Splash contains Splash's standard confidentiality clause:

> All non-public information, including the terms of this Agreement and any SOW, pricing, programs, brochures, reports, technical information, non-technical information, mailing lists, and other such information of any nature made available

to either Party by the other Party, by virtue of the association hereunder, including, but not limited to information relating to the Servies or the Platform and the ideas, technology, techniques, process and procedures constituting the Servies or the Platform, or relating to the use of the Services or the Platform and any information disclosed by Splash, in whatever form, that relates to the Services of the Platform (collectively, the "Confidential Information") shall be held in strict confidence and neither Party shall disclose any such Confidential Information to any other person or party without the written consent of the other Party.

*See* Rolfe Decl. Ex. A. Section 6.4 of the MSA further provides:

[CrowdStrike] shall not reverse engineer any Service or the Platform, or disassemble, decompile, or otherwise apply any procedure or process in order to ascertain, derive, and/or appropriate for any reason or purpose, the source code for same or other software provided or made available for use and/or access under this Agreement, or any algorithm, process, procedure or trade secret information contained in the Services provided by Splash.

*Id.*

Section 6.5 of the MSA further provides: that CrowdStrike "shall not copy or otherwise reproduce any software, any part or component of the Platform or the Services provided by Splash hereunder." *Id.* Additionally, only licensed, registered individual users with usernames and passwords may access the Splash platform. Zugyer Decl. ¶ 5.

Indeed, Splash endeavors to keep its platform confidential because it is highly valuable. Splash would never knowingly allow its competitors access to the full platform: if Splash's competitors had access to Splash's proprietary software, they could profit from Splash's many years of research, analysis, and product development to replicate Splash's design and architecture more efficiently and at less cost. Zugyer Decl. ¶ 8.

## C. In June 2025, Zuddl Infiltrates Splash's Platform Through a Licensed Customer's Account

In or about June 2025, CrowdStrike—in breach of the MSA—gave Zuddl extensive, unauthorized access to Splash's nonpublic platform. CrowdStrike had been a Splash customer since July 2020. Rolfe Decl. ¶ 5. In May 2025, Splash and CrowdStrike began negotiating a

renewal of the MSA, which was set to expire at the end of June. Declaration of Marisa Pierron ("Pierron Decl.") ¶ 2. Unbeknownst to Splash, CrowdStrike was simultaneously in talks with Zuddl about moving its Splash business there. *Id*.

Contract renewal negotiations continued through June 2025. Pierron Decl. ¶ 3. Finally, on June 25, CrowdStrike informed Splash that it would not renew its agreement with Splash under the terms the parties had operated under for years. *Id*. Instead, CrowdStrike asked Splash to reduce its number of paid user licenses from 117 to just 13; Splash declined to renew the agreement on those terms. *Id*. CrowdStrike's unexpected request to dramatically drop its number of user licenses raised red flags. Upon investigating CrowdStrike's account, Splash learned that CrowdStrike had created event pages with "Zuddl" in the name and privacy gated with the password "zuddl1teamdem08!" Rolfe Decl. ¶ 9. This discovery prompted Splash to further investigate CrowdStrike's user activity. *Id.* ¶¶ 8-9.

Splash's investigation revealed that while contract renewal talks were ongoing, CrowdStrike—in breach of the MSA—gave Zuddl direct access ***to the entire Splash platform*** by creating a fake user account for a Zuddl employee. Specifically, on June 17, 2025, CrowdStrike's Manager of Marketing Technology Teddy Babanao—using one of CrowdStrike's licenses— invited a new user with the email address "raj@zuddl.com" to CrowdStrike's Splash account. Rolfe Decl. ¶¶ 34, 35, 49. Within one minute of inviting "raj@zuddl.com" to CrowdStrike's account—no doubt realizing that a competitor's email address would raise alarm bells within Splash—Mr. Babanao deleted the "raj@zuddl.com" invitation from the CrowdStrike account and replaced it with the user "bubby.raj@gmail.com," in a clear attempt to conceal the identity of the user. *Id.* ¶ 16. The "bubby.raj@gmail.com" account was a view-only account that allowed the user to view the entirety of the Splash platform, but not make changes. *Id.* ¶ 17.

Zuddl's access did not stop there. Splash's investigation also revealed that, while the Zuddl employee was logged in, CrowdStrike began providing behind-the-scenes demonstrations of Splash's proprietary design and feature compilations to Zuddl. Rolfe Decl. ¶ 19. Specifically, CrowdStrike provided lengthy demonstrations to Zuddl on June 17 and June 18, 2025. *Id.* ¶ 22. In hindsight, it is clear that CrowdStrike asked to retain just 13 paid Splash licenses to facilitate the transition of its data to Zuddl. Through its investigation, Splash also discovered that CrowdStrike appears to have prepared page and event demonstrations for Zuddl as early as March 2025. It is not clear when Zuddl first viewed those demonstrations or otherwise gained unauthorized user access prior to June 17, 2025.

Zuddl's access to Splash's proprietary information continued over the following days and weeks, until Splash discovered the intrusion on June 25, 2025 and took immediate action to restrict Zuddl's ability to further access Splash's proprietary systems. Rolfe Decl. ¶¶ 8-9; 53. Splash's investigation into the breach uncovered that Zuddl accessed the platform on the following dates:

- On June 17, Mr. Babanao from CrowdStrike provided a nearly hour-long demonstration of several Splash features, showcasing how the Splash platform uniquely integrates tools such ████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████████████████. *Id.* ¶¶ 22, 26. Mr. Babanao also invited "Raj" from Zuddl to the CrowdStrike Splash account during this demonstration, and "Raj" accepted the invitation, thereby giving Zuddl full access to view Splash's design and features. *Id.* ¶¶ 17, 49.

- At the same time, "Raj" from Zuddl logged in to the Splash platform and perused various features. *Id.* ¶ 49.

- On June 18, 2025, CrowdStrike provided Zuddl with further demonstrations of key features of the Splash platform in a 40+ minute tour, zeroing in on the Event page in Splash's platform 

  ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉.

  CrowdStrike also highlighted Splash's Event Privacy page▉▉▉▉▉▉▉▉

  ▉▉▉▉▉▉▉▉▉▉▉▉ Finally, CrowdStrike demonstrated Splash's Event Settings page to Zuddl▉▉▉▉▉▉▉▉

  ▉▉▉. *Id.* ¶¶ 42-47.

- Also on June 18, 2025, Zuddl directly accessed Splash's platform through its CrowdStrike user account, viewing the My Events page. *Id.* ¶ 51.

- On June 25, 2025, Zuddl again accessed Splash's platform through its CrowdStrike user account, viewing the My Events page. *Id.* ¶ 52.

- On June 30, 2025, Zuddl attempted to access Splash's platform three separate times. However, Splash had discovered the incursion and deactivated the Zuddl user's account by then, so Zuddl's log in attempts were unsuccessful. *Id.* ¶ 53.

The findings from Splash's investigation are described in further detail below.

1.  *My Events Page Demonstration*

On June 17, 2025, Mr. Babanao provided Zuddl with a 47-minute-long demonstration of the Splash system, beginning with Splash's My Events page. Rolfe ¶¶ 26-27. The My Events

dashboard is an example of Splash's proprietary design, ████████████████████████

████████████████████████████████ Zugyer Decl. ¶ 9.

████████████████████████████████ Rolfe Decl. ¶ 27 ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* ████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ *Id.*

¶ 28. ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

*Id.*

      Mr. Babanao first demonstrated to Zuddl the ████████████████

Rolfe Decl. ¶ 29. ████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████. *Id.* ████████████████

████████████████████████████████████████████████████████████

████████████████████ *Id.* ¶ 30. ██████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████. *Id.*

      After showing Zuddl the home page, Mr. Babanao navigated back to the My Events page

and opened the Event Filters function, ████████████████████████████████████

████████████████████████████████████████████. Rolfe Decl. ¶ 31.

███████████████████████████████████████████████████. *Id.* ████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████. Zugyer

Decl. ¶ 9. ████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████. *Id.* ███████████████████████████████████

██████████████████████████████████████████████████████████████.

*Id.* ¶ 13. ████████████████████████████████████████████████

██████████████████████████████████████████████████████████████.

*Id.*

        █████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████,

Zuddl gained an otherwise-inaccessible understanding of a valuable, proprietary component of

Splash's platform. Zugyer Decl. ¶ 13.

        2.      *Library Page Demonstration*

        Next, Mr. Babanao opened the Library page ████████████████████████. Rolfe

Decl. ¶ 32. ██████████████████████████████████████████████████.

*Id.* ████████████████████████████████████████████. *Id.* ███

██████████████████████████████████████████████████████████████

        ███████     *Id.* The demonstration gave Zuddl access to another proprietary element of Splash's

design: its pre-built templates for ease of use and scalability. ████████████

████████████████████████████████████████████████████████████

████████████████. Zugyer Decl. ¶¶ 14, 20. ████████████████

████████████████████████████████. *Id.* ¶¶ 14, 15. ████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████. *Id.* ¶ 14. ████

████████████████████████████████████████████████████████████

████████████████████████████████████. *Id.* ¶ 16. ████████████

████████████████████████████████████



*Id.* ¶ 24(d).

████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████. Zugyer Decl. ¶ 28. ████

████████████████████████████████████████████████████████████

█████████████████. *Id.* ███████████████████████████████

████████████████████████████████████████████████. *Id.*

By gaining first-hand access Splash's Library page, Zuddl was able to view and learn how Splash implements its ██████████████████████████████████████

████████████████████████████████.

### 3. Team Page Demonstration

Next, Mr. Babanao navigated to the Team page ██████████████████████. Rolfe Decl. ¶ 33. ███████████████████████. *Id.* On this page, Mr. Babanao first demonstrated the layout, and then added raj@zuddl.com as a user to the CrowdStrike account. *Id.* ¶ 34. ████████████████████████████████████████

███████████████████████████████████████████

██████████████████████. *Id.* ¶ 35. █████████████████████████

████████████████████████████. *Id.* ██████████████████████████████

█████████████████████████████████████████ *Id.* By adding bubby.raj@gmail.com to the CrowdStrike account, Mr. Babanao gave Zuddl the ability to view the entire Splash platform. *Id.*

At this point, Raj accepted the invitation to join CrowdStrike's account and explored the platform, █████████████████████████████████████████████████

█████████████████. Rolfe Decl. ¶ 49. █████████████████████████████

█████████████████████████████████ for a few minutes while Mr. Babanao continued the demonstration. *Id.*

### 4. Confirmations Page Demonstration

Mr. Babanao navigated back to the My Events page, opened another event, and opened the Confirmations page for that event.  Rolfe Decl. ¶ 36.  ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████. *Id.* ██████████████████████

██████████████████████████████████. *Id.* ¶ 37.  Mr. Babanao showed Zuddl a specific event's configured Confirmations page, ████████████████ ████████████████████████████████████████. *Id.* ¶ 38.

████████████████████████████████████████████████████████

████████████████████████. *Id.*

████████████████████████████████████████████████████

████████████████████████████. Rolfe Decl. ¶ 39.  ██████████████

████████████████████████. *Id.* ████████████████████████

████████████████████████. *Id.* ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████. *Id.*

Again, the tour of this portion of the Splash platform allowed Zuddl to view Splash's otherwise confidential and proprietary page design.

### 5. Event Design Page Demonstration, Including Blocks Feature

Mr. Babanao logged onto the Splash platform again on June 18, 2025, in another apparent demonstration to Zuddl of its features and layout.  Rolfe Decl. ¶ 42.  During this 40+ minute

session, Mr. Babanao focused on features within specific, already-created event pages. *Id.* ¶¶ 42-47. He began by opening a specific, pre-created event and opening the event page design screen. *Id.* ¶ 42.

█████████████████████████████████████████

███████████████████████████████. Rolfe Decl. ¶ 42. ████████

██████████████████████████████████████████. *Id.*

Mr. Babanao spent more than 20 minutes on this page, ████████████████████

███████████████████████████████████████*Id.*

████████████████████████████████████████

███████████████████████. Zugyer Decl. ¶ 25. ████████████

██████████████████████████████████. *Id.* ¶¶ 25-27. ███████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████. *Id.* ¶ 24(a). ████████████████

████████████



*Id.* ████████████████████████████████████████████████████████

████████████████████████████████████████. *Id.* ¶ 25. ████████████████████

████████████████████████████████████████████████████. *Id.* ¶ 26.

████████████████████████████████████████████████████████████

████████████████████████████████████████████. *Id.* ████████████████

████████████████████████████████████████████. *Id.* ████

████████████████████████████████████████████████████████

████████████████████████████████. *Id.*

████████████████████████████████████████████████

████████████████████████████. *Zugyer Decl.* ¶ 27. ████████████████

████████████████████████████████. *Id.* ████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████. *Id.* ████████████████

████████████████████████████████████. *Id.*

Mr. Babanao's lengthy demonstration of the event design page, ████████████, gave

Zuddl access to another one of Splash's highly valuable and proprietary features.

> 6.    *Event Privacy, Integrations, and Settings Pages Demonstration*

After this, Mr. Babanao switched to a different, pre-created event and navigated to the

Event Privacy page.  *Rolfe Decl.* ¶ 43. ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████. *Id.* ████████████████████████████████████████. *Id.* ¶ 44.

Mr. Babanao spent approximately 20 minutes on the Event Privacy page, allowing Zuddl to see

exactly how Splash organizes its page for customer ease of use and brand compliance purposes. *Id.*

Mr. Babanao then opened another event and navigated to the Event Integration page inside the event settings. Rolfe Decl. ¶ 45. ████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████. Zugyer Decl. ¶ 11.

████████████████████████████████████████████████████████

████████████. Rolfe Decl. ¶ 45. ████████████████████████████. *Id.*

¶ 46. ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████. *Id.* ████████████████████████████████████

████████████████████████████████████████████████████

████████████. *Id.*

Mr. Babanao then opened another event and navigated to the Event Settings page. Rolfe Decl. ¶ 47. ████████████████████████████████████████

████████████████████████████████████████████████████




. *Id.*

. *Id.*

.

Following Mr. Babanao's two initial, lengthy demonstrations of the Splash platform, Zuddl's "Raj" accessed the Splash platform twice more, directly through its user account. Rolfe Decl. ¶¶ 51, 52. On both June 18 and June 25, Raj explored Splash's My Events page again in depth, viewing its layout, key features, and other elements of design impacting user experience. Rolfe Decl. ¶¶ 51, 52. Raj also made three separate attempts to access Splash on June 30, 2025, but Splash had deactivated his account and so he was unable to log on. *Id.* ¶ 53.

The features that Zuddl accessed and viewed—including the Splash platform's event types and seamless third-party integrations, pre-built templates for scalability and consistency, its brand differentiation by design, and efficiency and ease of use—make the Splash platform highly desirable to its customers and competitive in the market. Zuddl's access to the platform allows Zuddl to replicate the Splash platform's design and architecture and otherwise develop its platform and business strategy to compete with Splash. And without question, Zuddl's access to the platform also allowed it to poach CrowdStrike from Splash: CrowdStrike now uses Zuddl for the same or substantially similar services for which it used Splash. Pierron Decl. ¶ 4.

### D. CrowdStrike and Zuddl Fail to Respond to Splash's Repeated Requests for Key Information About the Breach, Necessitating This Lawsuit

On June 26, 2025, Splash, through undersigned counsel, sent Zuddl's co-founders Bharath Varma and Vedha Sayyaparaju a cease-and-desist letter. Declaration of Serine Consolino ("Consolino Decl.") ¶ 2. The letter noted that Zuddl's conduct violates at least two provisions of

the federal Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, and demanded that Zuddl "cease and desist all attempts to access the Splash Platform." *Id*. ¶ 3. In the letter, Splash demanded that Zuddl "cease and desist all attempts to access the Splash Platform" and asked Zuddl to identify "all instances where Zuddl (or any representative thereof) has accessed or viewed the Splash Platform, including (i) the date of access, (ii) the identities of any individuals who accessed the Splash Platform, and (iii) a description of all sites accessed." *Id*. ¶ 4. Splash further requested Zuddl to certify that it would "immediately refrain from viewing or accessing or attempting to view or access the Splash Platform" and not "use, consult, rely on, or disseminate (whether internally or to any third party)" any Splash information. *Id*. The following day, undersigned counsel sent the cease-and-desist letter to raj@zuddl.com and to the Oakley, California address identified on Zuddl's website. *Id*. ¶ 4.

To date, Zuddl has not responded to Splash's cease-and-desist letter or otherwise corresponded with Splash since this dispute arose. Consolino Decl. ¶ 5. Also on June 26, Splash, through undersigned counsel, sent a cease-and-desist letter to CrowdStrike. *Id*. ¶ 6. CrowdStrike responded to Splash's June 26 cease-and-desist letter in an unsigned letter from "CrowdStrike Legal" on June 30. *Id*. CrowdStrike confirmed that it provided Zuddl with "view-only" access to the Splash platform, including viewer access to information and materials belonging to Splash, and that Zuddl's access had been "revoked." *Id*. (It was revoked by Splash). CrowdStrike's June 30 letter disclosed that it had instructed Zuddl to "refrain from use of any information or materials it may have accessed belonging to Splash," that it was actively investigating the matter, and that it was preserving relevant materials. *Id*.

On July 11, 2025, CrowdStrike sent Splash a second (also unsigned) letter, in which it further conceded that: (a) a CrowdStrike employee had granted Zuddl unauthorized access (b)

CrowdStrike was subject to restrictions prohibiting such access, and (c) that the CrowdStrike employee who granted Zuddl access acted "without authorization." Consolino Decl. ¶ 7. CrowdStrike informed Splash that the employee had been "counseled and instructed not to repeat this conduct," and reiterated that Zuddl's access had been "revoked." *Id*.

On July 22, 2025, Splash, through undersigned counsel, responded to CrowdStrike's July 11 letter. Consolino Decl. ¶ 8. Splash noted that the July 11 letter failed to address key questions about the unauthorized access, including identifying "instances where Zuddl (or any representative thereof) has accessed or viewed the Splash Platform"; providing any communications between CrowdStrike and Zuddl; or providing screenshots of the information accessed. *Id*. Splash reiterated its request for additional information from CrowdStrike addressing "the basic facts underlying the breach event" so that Splash could fully assess its risk and determine appropriate next steps. *Id*. Splash also pointed out various inconsistencies and inaccuracies in CrowdStrike's correspondence. *Id*.

On August 4, 2025, CrowdStrike responded to Splash's July 22 correspondence, insisting that Zuddl's access was "brief," limited to "approximately 30 minutes," and was made for the "sole purpose of viewing landing pages and registration confirmation emails" to assist in "supporting a system migration." Consolino Decl. ¶ 9. These characterizations directly contradict the findings of Splash's investigation detailed above, which shows not only direct access by Zuddl on June 17, June 18, and June 25, but hours—not minutes—of detailed demonstrations by CrowdStrike of Splash's proprietary platform. Furthermore, Zuddl accessed far more information than what would be required for "system migration."

CrowdStrike's lack of transparency about the scope of Zuddl's access and continued refusal to provide key information—coupled with Zuddl's refusal to respond entirely—leaves

Splash with no choice but to seek this Court's assistance in protecting its trade secrets from further misappropriation by Zuddl.

### III. ARGUMENT

"A Rule 65 TRO [temporary restraining order] often functions to preserve the status quo until a court can enter a decision on a preliminary injunction application, while a Rule 65 preliminary injunction is often used to maintain the status quo until a court can enter a final decision granting a permanent injunction or some other final relief." *Dockery v. Young*, Civil No. 1:06CV370, 2006 WL 3313850, at *1 (W.D.N.C. Nov. 14, 2006) (unpublished) (citations omitted). "The standard for granting either a TRO or a preliminary injunction is the same." *Variable Annuity Life Ins. Co. v. Coreth*, 535 F. Supp. 3d 488, 501 (E.D. Va. 2021). A party seeking either form of injunctive relief "must establish [1] that he [or she] is likely to succeed on the merits, [2] that he [or she] is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his [or her] favor, and [4] that an injunction is in the public interest." *Id.* (citing *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).

Splash satisfies all four necessary elements for immediate injunctive relief. *First*, Splash is likely to succeed on the merits because Zuddl's conduct violates the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* ("DTSA") and Virginia Uniform Trade Secrets Act, Va. Code § 59.1-336, *et seq.* ("VTSA") (together, the "Trade Secrets Claims"). *Second*, Splash will suffer irreparable harm to its brand, market share, and customer goodwill if Zuddl is not enjoined from using Splash's trade secrets; courts in the Fourth Circuit recognize that loss of trade secrets constitutes *per se* irreparable harm. *Third*, the balance of the equities favors the imposition of a TRO when, as here, the only conceivable harm to Zuddl is harm it has brought upon itself. Finally, the public interest favors a TRO because it is well-recognized in the Fourth Circuit that the public interest favors the protection of trade secrets.

**A.** **Splash Is Likely to Succeed on the Merits of Its Trade Secrets Claims**

Under the both the DTSA and the VUTSA, a plaintiff must show "the existence of a protectable trade secret and misappropriation of that trade secret." *Variable Annuity*, 535 F. Supp. 3d at 515 (observing that "the standards applicable under the VUTSA are nearly identical to those under the DTSA" (internal quotations omitted)). Both allow "actual or threatened misappropriation" to be enjoined. *See* 18 U.S.C. § 1836(b)(3) (the court may "grant an injunction [] to prevent actual or threatened misappropriation"); Va. Code § 59.1-337 ("Actual or threatened misappropriated may be enjoined.").

The first element—a trade secret—broadly encompasses "all forms and types of financial, business, scientific, technical, economic, or engineering information," including "compilations" thereof, that (i) derive "economic value from not being known to, and not readily ascertainable by" others, and (ii) are the subject of "reasonable efforts" to maintain its secret. *See* 18 U.S.C. § 1839(3) (defining trade secret); *see also Variable Annuity*, 535 F. Supp. at 513 ("[N]early any type of information can be subject to trade secret protections under [the VUTSA], so long as the information (i) has independent economic value by virtue of its being secret and (ii) is subject to reasonable efforts to maintain that secrecy."). The second element—misappropriation—occurs "when a person either (1) acquires a trade secret while knowing, or having reason to know, that the trade secret was acquired by improper means, 18 U.S.C. § 1839(5)(A), or (2) uses or discloses the trade secret after acquiring it through improper means, *id.* § 1839(5)(B)(i)." *Id.*; *see also* Va. Code § 59.1-336 (same).

Both elements are easily met here: (i) the Splash platform is a highly valuable compilation of data that derives value from not being "readily ascertainable" by Splash's competitors and which is subject to "reasonable efforts" to maintain its secrecy, and (ii) Zuddl has both "acquired"

and "used" the Splash platform without authorization within the meaning of the DTSA and VUTSA. Splash is thus likely to succeed on the merits of its Trade Secrets Claims against Zuddl.

### 1.    *The Splash Platform Is Unequivocally a Trade Secret*

***First,*** the Splash platform derives "economic value" from not being "generally known" or "readily ascertainable" to its competitors, because its intuitive design and feature compilation create a highly sought-after, seamless user experience that gives Splash its competitive edge. If Splash's competitors had access to Splash's proprietary platform, they could change their business strategy to compete with Splash and/or, with the benefit of information about the Splash platform, replicate the same or similar functionality as Splash more efficiently and at less cost. *See Advanced Recovery Sys., LLC v. Am. Agencies, LLC*, No. 2:13-cv-283-DAK, 2016 WL 6916539, at *9 (D. Utah Sept. 28, 2016) (unpublished) (finding plaintiff "derives economic value" from data when, "[w]ith access to the data, competitors could gain a competitive advantage over [plaintiff]").

Further, "[i]t is [] axiomatic that ***compilations*** of information receive trade secret protection, even where the component parts contained therein are publicly available." *IHS Global Ltd. v. Trade Data Monitor, LLC*, No. 2:18-cv-01025-DCN, 2021 WL 2134909, at *7 (D.S.C. May 5, 2021) (unpublished) (emphasis added).[5] Though discrete aspects of the Splash platform may

---

[5] *See also United States v. Nosal*, 844 F.3d 1024, 1042 (9th Cir. 2016) ("It is well-recognized that 'it is the secrecy of the claimed trade secret as a whole that is determinative,' and '[t]he fact that some or all of the components of the trade secret are well-known does not preclude [trade secret protection].'" (quoting Restatement (Third) of Unfair Competition § 39 (1995)); *AvidAir Helicopter Supply, Inc. v. Rolls-Royce Corp.*, 663 F.3d 966, 972 (8th Cir. 2011) (compilations of publicly available information can be a trade secret, and "the fact that some or even most of the information was publicly available is not dispositive"); *MicroStrategy Inc. v. Business Objects, S.A.*, 331 F. Supp. 2d 396, 417 (E.D. Va. 2004) ("[I]t is clear that a compilation of public facts can also constitute a trade secret if the compilation itself has remained confidential."); *Woven Elecs. Corp. v. Advance Grp., Inc*., Nos. 89-1580, 89-1588, 1991 WL 54118 at * 3 (4th Cir. Apr. 15, 1991) (trade secret protection "may exist solely in the manner in which a group of items is put to use, even though each of the items is itself within the public domain.").

be publicly available, the proprietary platform in its entirety is not "readily ascertainable" to its competitors and only available to its licensed users. In short, absent misconduct, Splash's competitors cannot view the cohesive design and architecture of the platform necessary to replicate the Splash product.

**Second**, the Splash platform is "the subject of efforts that are reasonable under the circumstances to maintain [its] secrecy." *Variable Annuity*, 535 F. Supp. at 513 (citing Va. Code § 59.1-336). Splash requires all customers and employees to sign robust confidentiality agreements before accessing the Splash platform and further restricts access to registered users with paid-for licenses and passwords. These steps are more than enough to confer trade secret protection under the DTSA and the VUTSA. *See id.* (confidentiality agreements and access restrictions are "reasonable efforts" to maintain secrecy of data); *Catalyst & Chem. Servs., Inc. v. Glob. Ground Support*, 173 F. App'x 825 (Fed. Cir. 2006) ("Maintaining trade secret status thus requires only reasonable efforts, such as implementing confidentiality agreements.").[6]

    2.    *Zuddl Misappropriated the Splash Platform Both by "Acquiring" the Trade Secrets Through Improper Means and by "Using" the Trade Secrets to Poach CrowdStrike*

Both the DTSA and the VUTSA provide that misappropriation occurs "when a person either (1) acquires a trade secret while knowing, or having reason to know, that the trade secret was acquired by improper means, 18 U.S.C. § 1839(5)(A), or (2) uses or discloses the trade secret after acquiring it through improper means, *id.* § 1839(5)(B)(i)." *Variable Annuity*, 535 F. Supp.

---

[6] *See also MicroStrategy*, 331 F. Supp. 2d at 416 ("Restricting access to information, implementing confidentiality agreements, and providing physical barriers to access are all reasonable efforts."); *John Bean Techs. Corp. v. B GSE Grp., LLC*, 480 F. Supp. 3d 1274, 1299 (D. Utah 2020) (confidentiality agreement, combined with training and proprietary wording clauses in documents, constituted a reasonable, "practical measure to maintain the secrecy"); *ATS Grp., LLC v. Legacy Tank & Indus. Servs. LLC*, 407 F. Supp. 3d 1186, 1199 (W.D. Okla. 2019) (password protections and restricted access constitute reasonable efforts to maintain secrecy).

3d at 515; Va. Code § 59.1-336 (same); *see also ClearOne Advantage, LLC v. Kersen*, 710 F. Supp. 3d 425, 435 (D. Md. 2024) ("The plaintiff can show misappropriation simply by demonstrating that the defendant acquired [the] trade secret by improper means, even if the plaintiff cannot show use of that trade secret." (internal quotations removed)). Improper means under both statutes "includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Variable Annuity*, 535 F. Supp. 3d at 515 (quoting 18 U.S.C. § 1839(6)); *see also* Va. Code § 59.1-336 (same).

Zuddl has both "acquired" and "used" information from the Splash platform in violation of the DTSA and VUTSA. First, Zuddl ***acquired*** the trade secret through "improper means" by using a fake user account intended to conceal its identity and inducing CrowdStrike to breach the MSA. *See* 18 U.S.C. § 1839(5)(A); Va. Code § 59.1-336. Second, Zuddl ***used*** the information from the Splash platform—which was acquired by improper means—to poach CrowdStrike and facilitate its transition from Splash to Zuddl. *See* 18 U.S.C. § 1839(5)(B)(i); Va. Code § 59.1-33.

Further, Zuddl's possession of Splash's trade secrets imminently threatens Splash's business. Importantly, the DTSA and VUTSA also give the Court the power to enjoin ***threatened*** misappropriation. *See* 18 U.S.C. § 1836(b)(3) (the court may "grant an injunction [] to prevent actual or threatened misappropriation"); Va. Code § 59.1-337 (same). "[P]arallel competition for identical opportunities substantially and sufficiently 'threatens' misappropriation or misuse." *Peraton, Inc. v. Raytheon Co.*, No. 1:17-cv-979, 2017 WL 11501665, at \*3 (E.D. Va. Nov. 7, 2017). Zuddl's own words and conduct compel the conclusion that its future "use" is all but inevitable: Zuddl touts itself a Splash competitor, used deceptive means to access the platform, spent hours viewing vast components of the platform's design and architecture, has already used the Splash platform to steal one Splash customer, and has refused to respond to Splash's cease-

and-desist letter or otherwise correspond with Splash. Without the Court's intervention, nothing will stop Zuddl from using the wrongly acquired information to develop its product and compete with Splash. *See Assa Abloy Sales and Marketing Group, Inc. v. TASK, Fcz*, No. 3:15-cv-656 (JAM), 2018 WL 691711, at *8 (D. Conn. Feb. 2, 2018) ("Defendant's continued possession of this information poses a threat to plaintiff, as defendant could use the information to gain an unfair competitive advantage.").

### B.  Splash Will Suffer Irreparable Harm If Zuddl Is Not Enjoined

Courts in the Fourth Circuit recognize that the disclosure of trade secrets constitutes *per se* irreparable harm. *See Peraton*, 2017 WL 11501665, at *4 ("The disclosure of trade secrets establishes immediate irreparable harm because a trade secret, once lost is, of course, lost forever." (quoting *Home Funding Grp., LLC v. Myers*, No. 1:6-cv-1400, 2006 WL 6847953, at *2 (E.D. Va. Dec. 14, 2006))); *see also Update, Inc. v. Samilow*, 311 F. Supp. 3d 784, 796 (E.D. Va. 2018) ("[T]he Fourth Circuit has repeatedly recognized that [t]he threat of a permanent loss of customers and the potential loss of goodwill also support a finding of irreparable harm." (internal citation and quotations omitted)).

Further, "a complainant need not allege or prove irreparable harm when it involves a statute that authorizes injunctive relief. All that need be proved is a violation of the statute." *Peraton*, 2017 WL 11501665, at *4 (quoting *Capital Tool & Mfg. Co., Inc. v. Maschinenfabrik Herkules, Hans Thoma GmgH*, 837 F.2d 171, 172 (4th Cir. 1988)). Because Splash is likely to succeed on the merits of its trade secrets claims, Splash has sufficiently demonstrated the threat of irreparable harm necessary to support a limited TRO and/or preliminary injunction.

**C.      The Equities and Public Interest Also Favor Immediate Relief**

The balance of the equities also weighs decisively in Splash's favor because the harm to Splash from the threatened use of its trade secrets is substantial, but the entry of a TRO will impose *zero* harm on Zuddl.  Where "the only harm Defendants would suffer is the self-inflicted harm that comes to those who base their businesses on trade secrets stolen from a competitor, [ ] a balancing of the equities strongly favors granting an injunction." *API Technical Svcs, LLC v. Francis*, No. 4:13-cv-l42, 2013 WL 12131381, at *3 (E.D. Va. Dec. 4, 2013) (quoting *E.I. du Font de Nemours & Co. v. Kolon Indus., Inc.*, 894 F. Supp. 2d 691, 709 (E.D. Va. 2012)).

Lastly, the public interest favors injunctive relief because—as Courts in the Fourth Circuit have repeatedly recognized—"the public interest favors the protection of confidential business information." *Variable Annuity*, 535 F. Supp. 3d at 519 (citations omitted); *see also API Tech. Servs*, 2013 WL 12131381, at *2 ("There is no doubt that it is in the public interest to protect trade secrets and to protect competitors from behavior of the sort engaged in by defendants." (internal citations and quotations omitted)); *ClearOne Advantage*, 710 F. Supp. 3d at 89 ("[T]he public interest supports entry of a Preliminary Injunction because [] the public interest favors the protection of trade secrets.").

In sum, Splash meets all four factors for the imposition of a TRO until a preliminary injunction hearing can be held—and without an injunction, "there is a substantial risk that the defendants will continue to divulge or misappropriate trade secrets in the absence of court action." *ClearOne Advantage*, 710 F. Supp. 3d at 436.

**D.      Both Zuddl As Well As Any Affiliates, Contractors, or Employees of Zuddl Should Be Included in the Scope of Any Injunction**

Rule 65(d) of the Federal Rules of Civil Procedure expressly permits the Court to bind not only the party's officers, agents, servants, employees, and attorneys, but also those "in active

concert or participation" with a party. Fed. R. Civ. P. 65(d)(2)(C); *see also Bone v. Univ. of North Carolina Health Care System*, 678 F. Supp. 3d 660, 710 (M.D.N.C. 2023). Rule 65(d)(2) makes an injunction binding on nonparties "who are in active concert or participation" with an enjoined party. Fed. R. Civ. P. 65(d)(2). "The purpose of this rule is to prevent defendants from 'nullifying a decree by carrying out prohibited acts through aiders and abettors.'" *K.C. ex rel. Africa H. v. Shipman*, 716 F.3d 107, 115 (4th Cir. 2013) (quoting *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945)).

As allowed by Rule 65, both Zuddl as well as any affiliates, employees, or contractors of Zuddl should be included in the scope of any order that enjoins Zuddl from use of Splash's trade secrets. Otherwise, Zuddl could thwart the injunction by acting through "aiders and abettors," rendering it toothless. *Africa H.*, 716 F.3d at 115.

### E. Any Required Bond Should Be Nominal

Any TRO granted by this Court must be secured "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Given the limited scope of the requested injunctive relief, no bond should be required. To the extent any bond is required, it should be only for a nominal amount, especially for purposes of the requested short-term TRO. Any dispute as to the appropriate amount of a preliminary injunction bond, if any, can be addressed as part of Splash's request for a preliminary injunction.

### IV. CONCLUSION

For the foregoing reasons, Splash respectfully requests that the Court enter a Temporary Restraining Order and preliminary injunction ordering Zuddl and its agents, affiliates, employees, and those persons in active concert or participation with Zuddl, including Crowdstrike, not to use,

review, copy, disclose, reveal, or profit from any information pertaining to the Splash platform pending a final determination on the merits.

Dated: August 12, 2025

Respectfully submitted,

AEGIS LAW GROUP LLP

/s/_____
Serine Consolino (Va. Bar No. 95481)
Ann Rakestraw (*pro hac vice* pending)
Rachel E. Mueller (*pro hac vice* pending)
801 Pennsylvania Avenue N.W., Suite 740
Washington, D.C. 20004
Tel.: 202-737-3500
sconsolino@aegislawgroup.com
arakestraw@aegislawgroup.com
rmueller@aegislawgroup.com

*Counsel for Plaintiffs Cvent, Inc. and One Clipboard, LLC d/b/a Splash*