1

1        UNITED STATES DISTRICT COURT
         EASTERN DISTRICT OF VIRGINIA
2             ALEXANDRIA DIVISION

3    ------------------------------------x
                                         :
4    CVENT, INC., and ONE CLIPBOARD, LLC  : Civil Action No.:
     d/b/a SPLASH                        : 1:25-cv-1341
5                        Plaintiff,      :
          v.                             :
6                                        :
     JOYN EXPERIENCES, INC., d/b/a ZUDDL,  : August 26, 2025
7                                        :
                     Defendant.          :
8    ------------------------------------x

9              TRANSCRIPT OF MOTION HEARING
        BEFORE THE HONORABLE ROSSIE D. ALSTON, JR.,
10         UNITED STATES DISTRICT COURT JUDGE

11              A P P E A R A N C E S

12   FOR THE PLAINTIFF:     RACHEL E. MUELLER, ESQ.
                            SERINE R. CONSOLINO, ESQ.
13                          ANN H. RAKESTRAW, ESQ.
                            Aegis Law Group LLP (DC-NA)
14                          801 Pennsylvania Ave, NW
                            Suite 740
15                          Washington, DC 20004
     FOR THE DEFENDANT:     DUNCAN G. BYERS, ESQ.
16                          Gordon Rees Scully Mansukhani, LLP
                            Virginia
17                          5425 Discovery Park Boulevard
                            Suite 200
18                          Williamsburg, VA 23188

19

20

21

     OFFICIAL U.S. COURT REPORTER:   MS. TONIA M. HARRIS, RPR
22                                   United States District Court
                                     401 Courthouse Square
23                                   Tenth Floor
                                     Alexandria, VA 22314
24

25

2

1                         TABLE OF CONTENTS

2    On behalf of the Plaintiff:

3    Katherine Rolfe

4            Direct examination by Ms. Mueller............. 26
             Cross-examination by Mr. Byers................ 44
5            Redirect examination by Ms. Mueller........... 56
             Recross-examination by Mr. Byers.............. 63

6

7                            MISCELLANY

8    Preliminary matters.................................. 03
     Certificate of Court Reporter....................... 80

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Cvent, Inc. V. Joyn Experiences

3

1               **P R O C E E D I N G S**

2  (Court proceedings commenced at 10:04 a.m.)

3

4               THE COURTROOM CLERK:  Civil action 2025-1341.  Cvent

5  Incorporated, et al versus Joyn Experiences, Incorporated.

6               Counsel, please note your appearances for the

7  record.

8               MS. CONSOLINO:  Good morning, Your Honor.  I'm

9  Serine Consolino and I'm here on behalf of plaintiffs.

10              THE COURT:  Good morning.

11              MS. MUELLER:  And good morning, Your Honor.  I'm

12  Rachel Mueller, I'm here with Ms. Consolino and I have a PHV

13  pending.

14              THE COURT:  Very good.  Good morning.

15              MR. BYERS:  Good morning, Your Honor.  Duncan Byers

16  for the defendant.

17              THE COURT:  Good morning.

18              First thing, with regard to -- I apologize if I

19  mispronounce the name -- Ms. Rakestraw, it says on your

20  application for pro hac vice that you are a member of D.C., is

21  that D.C. Superior Court or D.C. Federal Court?

22              MS. MUELLER:  Both.

23              THE COURT: All right.  That makes it simple.  Both

24  motions for pro hac vice will be granted.

25              MS. MUELLER:  Thank you, Your Honor.

─Cvent, Inc. V. Joyn Experiences─

4

1          THE COURT:  Very good.  All right.  This is

2   plaintiffs' case.  You can take the lead.  I will inform all

3   counsel that I've read the positions in the case, and I

4   understand completely your perspective in the case so you

5   don't need to rehash things that you sort of provided in your

6   brief.  As an old judge used to tell me when I practiced law,

7   I don't need you to read me your brief with gestures, so just

8   go ahead and tell me your perspective on the case.

9          MR. BYERS:  Your Honor, I'm sorry, on that point

10  really quick.  I apologize to the Court, I've only been in the

11  case since the 22nd.  So I did not have an opportunity to

12  brief the matter for the Court, but I am prepared to defend

13  against the motion.

14         THE COURT:  You filed an answer at 9:30 p.m. last

15  night so it looks like you were working late as we were

16  required to.

17         MR. BYERS:  Absolutely, Your Honor.

18         THE COURT:  Very good.

19         MS. CONSOLINO:  Good morning, Your Honor.  We're

20  here today because Splash recently learned that defendant,

21  Zuddl, a recently founded startup, who markets itself as a

22  Splash competitor from a period of March through June of this

23  year, secretly accessed large portions of the Splash platform

24  without authorization.

25         As we explain in our motion papers, the full Splash

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─Cvent, Inc. V. Joyn Experiences─

5

1   platform is available only to its licensed customers who

2   signed confidentiality agreements.  And I am just going to

3   touch on a few points that we didn't really focus on in our

4   motion papers.

5           Zuddl circumvented these access restrictions in two

6   ways.  We now know that beginning in March of 2025, an

7   employee of the Splash customer, CrowdStrike, named Teddy

8   Babanao, began creating demo pages corresponding to each of

9   Splash's 13 event types, as our witness, Kate Rolfe, will

10  testify about today.  And he began providing demonstrations --

11          THE COURT:  I'm anticipating an objection.

12          MR. BYERS:  Yes, Your Honor.  First off, Counsel is

13  testifying.  Second off, we have apparently two witnesses in

14  the courtroom, and I would like to exclude the witnesses.

15          MS. CONSOLINO:  Actually, just one.

16          MR. BYERS:  Just one witness?  Okay.

17          THE COURT:  All right.  I'm interpreting her

18  presentation as in a nature of an opening statement, but I

19  will apply the rule against witnesses.  There's only one

20  witness.  I guess we don't need to apply it other than the

21  fact that you're providing your opening statement it might

22  provide a prelude as to what she is going to say so I'm going

23  to ask her to step out.

24          MS. CONSOLINO:  Okay.

25          THE COURT:  Okay.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

Cvent, Inc. V. Joyn Experiences

6

1      MS. CONSOLINO:  Second, in June 2025 Mr. Babanao

2  added a Zuddl employee to CrowdStrike's user account.  We know

3  that he was trying to conceal his tracks because Mr. Babanao

4  initially tried to add the user email address raj@zuddl.com,

5  and then within minutes deleted raj@zuddl.com and created the

6  user account bubby.raj@gmail.com.  Why do we know that he was

7  trying to conceal his tracks?  Because he could have just

8  updated the email address corresponding to the account.  In

9  other words, he could have just switched raj@zuddl.com with a

10  bubby.raj@gmail.com, but he didn't.  He deleted the

11  raj@zuddl.com account, presumably, to conceal his tracks, and

12  then replaced it with bubby.raj@gmail.com.

13      Because of his hours of unauthorized access to the

14  Splash platform, Zuddl has obtained for free what has taken

15  Splash millions of dollars and years of research testing and

16  analysis to develop.  As we explain in our motion papers, we

17  meet all four requirements for a TRO, and I'm going to focus,

18  in particular, on the likelihood of success on the merits.

19  And a plaintiff seeking a TRO, as Your Honor knows, under the

20  trade secret statutes must show, A, that the information is a

21  trade secret; and second, relevant here, that the defendant

22  threatens to use a trade secret.

23      THE COURT:  There's a suggestion, in the filings

24  that the Court has received, that many of the things that you

25  suggest are a violation from your client's perspective, are

Cvent, Inc. V. Joyn Experiences

7

1    readily available on the YouTube channel.

2            How does that impact things?

3            MS. CONSOLINO:  So Ms. Rolfe will testify about why

4    some of the things are publicly available on the YouTube

5    channel for marketing purposes, but certainly not all the

6    things that we wish to protect.  And what we are protecting

7    here, what we are claiming trade secret protection over is the

8    entire Splash platform.  In particular, one of Splash's

9    distinguishing features is its scalability.  And its one of

10   the reasons that Cvent acquired Splash in 2024, and what Zuddl

11   is able to access is the platform architecture that enables

12   that scalability.  And that's one of the truly valuable and

13   distinguishing features of Splash and they were able to see

14   how that scalability works in realtime, and that's not

15   publicly available.

16           And our witness, Ms. Rolfe, will testify about that.

17   And also, the case law is very clear that compilations of

18   publicly available information still can merit trade secret

19   protection if the compilation is not publicly available.  And

20   Splash's website is not publicly available to anybody except

21   its licensed users who signed robust confidentiality

22   agreements.  Splash monitors user access to ensure that its

23   competitors don't log in to its site, and that's how they

24   detected this unauthorized access to begin with.

25           So I would like to focus the Court's attention on a

─────Cvent, Inc. V. Joyn Experiences─────

8

1    case that we don't cite in our brief, but it's on point.  It's

2    a Fourth Circuit case from 2018.  And I've already given

3    opposing counsel a copy, and I'll give Your Honor a copy at

4    the end of the hearing.  It's called *AirFacts, Inc. de*

5    *Amezaga*, and the citation is 909 F.3d 84, 96.  In this case,

6    the plaintiff manufactured an auditing software that analyzed

7    ticket fairs for airlines and travel agencies to ensure

8    tickets are sold for the appropriate price.

9         The defendant, a former employee, absconded with

10   float charts displaying ticket price rules and then argued

11   that much of it was publicly available and so did not warrant

12   trade secret protection.

13        The Fourth Circuit held that that, quote, The

14   defendant's painstaking expert arrangement of the data made

15   the flowcharts inherently valuable separately and apart from

16   the publicly available components.  It is the value that

17   the -- that the defendant added by incorporating things that

18   establishes the flowcharts as unique items of economic value.

19        And I'll also refer the Court to one of the cases we

20   cite in our brief, a recent case from the district of South

21   Carolina, which says, Courts have found with near uniformity

22   that risks compiling pricing, product, supplier information

23   constitute protectable trade secrets even where the

24   information they contain is publicly available.

25        So here, the isolated clips that are used for

─Cvent, Inc. V. Joyn Experiences─

9

1  marketing purposes, don't reflect the design and architecture

2  of the entire platform.  And again, that is what Splash is

3  claiming trade secret protection over.  How to navigate to one

4  page to another.  How all the pages are mapped together.  The

5  integration of all the various components.  What the workflows

6  are like for attendees, the layout, and field of the website.

7  None of that is reflected in the isolated clips available

8  online.  Again, there is isolated clips that are available

9  just for marketing purposes, but Splash would not have these

10  robust confidentiality protections and charge its users.

11  Cvent would not have acquired Splash for nine figures if all

12  of this information were available for its competitors to

13  copy.

14         So Zuddl accessed a wealth of information that is

15  not available online.  That information is the product of

16  years of iterative testing, analysis, and development.  And if

17  defendants' insistence that this information is really

18  publicly available is correct, it does beg the question why

19  would Zuddl go to such great lengths, to a ten-hour of

20  demonstrations, to create a fake user account, if this

21  information were all available on the public.

22         THE COURT:  I think I understand your point.

23         MS. CONSOLINO:  I beg your pardon, Your Honor.

24         THE COURT:  I think I understand your position.

25         MS. CONSOLINO:  I don't want to repeat anything

Cvent, Inc. V. Joyn Experiences

10

1 that's in my motion papers so I'm just going to briefly look

2 over my notes to see if there's anything else that I should

3 address.

4          (A pause in the proceedings.)

5          MS. CONSOLINO:  I also want to address one point.

6 To the extent that Zuddl is claiming in their answer that they

7 accessed limited information for the purpose of transitioning

8 a new client, that's just not credible.  They accessed far

9 more information than would be necessary if they were just

10 transitioning a new client.  And as Ms. Rolfe will testify,

11 Zuddl's user account was a view-only account, which doesn't

12 even allow users to download information.  So it would

13 actually be useless.  The type of account that was created

14 would actually be useless for the purposes of transitioning

15 that information to a new software platform.

16          I will note, Your Honor, that the relief we're

17 seeking here is very limited.  You know, we were not hoping to

18 have to come here today.  We were hoping that Zuddl would have

19 picked up the phone and said, we'll agree not to use your

20 information, and then we wouldn't have had to be here today,

21 but they haven't done that.  So we are asking for this --

22          THE COURT:  Probably because they think they are

23 entitled to use it is why the case didn't settle.

24          MS. CONSOLINO:  Apparently so.  But they did

25 misappropriate the information, you know.  If again, if it

Cvent, Inc. V. Joyn Experiences

11

1    were all publicly available then it does beg the question why

2    they spent so many hours creating demonstration pages just for

3    Zuddl and why they created a user account and then tried to

4    conceal their tracks.

5           THE COURT:  And your position is that the arguably

6    nefarious approach that they took to gathering information

7    suggest the impropriety of what they did?

8           MS. CONSOLINO:  Yes.

9           THE COURT:  Okay.

10          MS. CONSOLINO:  Thank you, Your Honor.

11          THE COURT:  Response.

12          MR. BYERS:  Thank you, Your Honor.  So, Your Honor,

13   first thing first.  I want to address the case that was just

14   handed to me this morning, the *AirFacts v. Amezaga* case.  That

15   case is not on point.  It is distinguishable if the Court

16   reviews it in the first column on page -- well, I'm sorry, the

17   second column on page 8 rolling over to the first column on

18   page 9, the difference between the *AirFacts* case and the case

19   here is that the collection and organization of the pieces and

20   parts that were available to the public were put together in a

21   unique manner and never shown to the public.  It was an

22   internal operation.  There's no allegation in here that

23   anybody in the public could go to training videos or the like

24   demonstrating how the platform was used and the like.

25          So we agree that it is possible to take elements,

Cvent, Inc. V. Joyn Experiences

12

1    each of which they are readily available to the public, and

2    put them together in a new configuration and have those become

3    trade secret as long as the owner of the information maintains

4    them in a manner that is -- that's consistent with them being

5    a trade secret.  That's not the case here.  And despite the

6    representations of counsel, the information on YouTube is not

7    limited to just marketing demonstrations.  And as I'm going to

8    be showing the Court in a little bit when we get to it, there

9    are at least two series of YouTube videos that demonstrate the

10   full functionality of the platform and their training videos

11   specifically to show operators how to use the system,

12   including how it integrates the different pages and the like.

13   But the Court will see that when we get to that point.  But I

14   need to hit a couple of big points here, Your Honor.

15              First is, the Court can't grant the relief being

16   sought by the plaintiffs in their motion.  And the reason is,

17   is because in their motion for the injunction, they are asking

18   the Court to enjoin Zuddl in combination with CrowdStrike.

19   CrowdStrike isn't before the Court for some reason.

20   CrowdStrike is not a named defendant, and yet, in their

21   request for relief, the plaintiffs specifically ask the Court

22   to -- I apologize I will get to it -- specifically ask the

23   Court to answer a temporary restraining order and preliminary

24   injunction ordering Zuddl and its agents, affiliates,

25   employees, and those persons in active concert or

─Cvent, Inc. V. Joyn Experiences─

13

1  participation with Zuddl, including CrowdStrike, not to use,

2  review, copy, disclose, or reveal a profit from any

3  information pertaining to the Splash platform pending a final

4  determination on the merits.

5          So the relief they've asked for is asking the Court

6  to enter an injunction against --

7          THE COURT:  A non-named party.

8          MR. BYERS:  A non-named party.  So that's the first

9  problem they have.  The second problem also --

10          THE COURT:  Before you move to the second problem,

11  just a quick answer, why wasn't CrowdStrike made a party to

12  the litigation?

13          MS. CONSOLINO:  Thank you, Your Honor.  CrowdStrike

14  -- there is an error in our motion -- actually, in our

15  proposed order we did remove CrowdStrike from the relief

16  requested in our memorandum of law and our proposed order.  So

17  I think there is an error in just our cover motion.  We did

18  not intend to include CrowdStrike to answer your question more

19  directly.  We didn't name CrowdStrike from the litigation

20  because they are not a competitor and our concern is to

21  prevent competitors from --

22          THE COURT:  But based upon your opponent colleague's

23  representation, the breadth of the relief sought in your

24  original filing is not available to you because CrowdStrike is

25  not made a party of the litigation.

Cvent, Inc. V. Joyn Experiences

14

1          MS. CONSOLINO:  Your Honor, under Rule 65, Rule 65

2   does allow the Court to enjoin parties acting in concert with

3   named parties.  And there's a lot of case law saying you don't

4   need to --

5          THE COURT:  Don't you have to provide the notice

6   though?

7          MS. CONSOLINO:  CrowdStrike -- we could provide them

8   notice, but we're not asking for CrowdStrike to be enjoined in

9   any event so we can strike that -- we can remove that demand

10  from our cover motion, but we do believe that Rule 65 would

11  have allowed it.  But we're not asking the Court to enjoin

12  CrowdStrike at this point because they're not -- candidly,

13  they are not a competitor.  We don't think there's a risk that

14  they're going to reverse engineer our platform and that's a --

15         THE COURT:  Counsel, you won a little bit already so

16  you can move on to your next point.

17         MR. BYERS:  The next point also pertains to

18  CrowdStrike, Your Honor.  A review of the complaint shows that

19  out of the 126 paragraphs outlining both the underlying facts

20  of the case and the claims, of those, 47 of those paragraphs

21  speak specifically to actions taken by CrowdStrike, the

22  majority of them discussing a breach of their agreement with

23  Splash and putting blame squarely at the doorstep of

24  CrowdStrike.  CrowdStrike is a necessary party, Your Honor.  I

25  don't know how, based upon their allegations, the Court can

Tonia M. Harris OCR-USDC/EDVA 703-646-1438

EASTERN DISTRICT OF VIRGINIA

─Cvent, Inc. V. Joyn Experiences─

15

1    give any relief whatsoever without them being in the case.

2         THE COURT:  Wouldn't they just have to meet the

3    standard of necessary party for just adjudication?  And if

4    they are not seeking any specific relief from CrowdStrike it

5    sort of a reference to someone who is part and parcel of the

6    factual background of the case as opposed to someone who is

7    subjected to injunctive relief.

8         MR. BYERS:  I understand that, Your Honor, but the

9    problem for my client is that my client is being sued for and

10   blamed for actions being taken on behalf of CrowdStrike or by

11   and through CrowdStrike.  My client, and there's nothing in

12   the complaint and there's nothing in the -- there's nothing in

13   their memo in support of their motion or in their motion

14   itself that refutes the fact that despite their assertions and

15   open-ended assertions, without any facts in support of them

16   that somehow Zuddl is responsible for this, they admit in

17   their facts that CrowdStrike set up an account for Zuddl, that

18   CrowdStrike brought Zuddl in, that CrowdStrike demonstrated

19   the platform.  So all of my client's interactions were at the

20   direction of and at the behest of CrowdStrike.  So I will

21   leave that there, Your Honor, and move on to the next point.

22        The information that the plaintiff's claim is

23   proprietary is publicly available, all of it.  And as I said,

24   we're going to be demonstrating to the Court here in a little

25   bit --

─────Cvent, Inc. V. Joyn Experiences─────

16

1          THE COURT:  And I think that the distinction that's

2    being made by your opponent colleague is that while it might

3    be available at the -- and the platform, for lack of a better

4    way of putting it, is available, the nuts and bolts, and how

5    the platform work is something that is not available through

6    public access.

7          MR. BYERS:  We agree, Your Honor.  The underlying

8    code and the underlying engineering architecture is not

9    available to the public and they admitted -- my colleague

10   admitted in her opening that he -- my client only had viewing

11   ability.  And she stated, specifically, that my client had no

12   ability to get into the underlying architecture and structure

13   and could not copy it.  That's what she said in her opening.

14   So under the circumstances, the only thing that my client had

15   access to was the user interface and that's it.  What they are

16   claiming is, they are claiming now that there are certain

17   portions of the user interface that are protectable trade

18   secrets and there are some that aren't.  They never said that

19   in the complaint, they didn't clarify that in their memo in

20   support of the motion or in the motion itself.

21          And again, as we will demonstrate to the Court, all

22   of this functionality that they are claiming is a trade secret

23   and only available under the Master Services Agreement with

24   Splash, is available online on any of the training videos.

25   These aren't just marketing videos, these are training videos

┌─ Cvent, Inc. V. Joyn Experiences ─

17

1   that show users and potential users exactly how to interact

2   with and use the platform and the functionality of the

3   platform.

4          So unless -- unless Splash can identify for us

5   exactly which pieces and parts it is that they are claiming

6   are protectable trade secrets, they can't show that my client

7   accessed protectable trade secrets.  They've already admitted,

8   and not just in the opening, but also in the complaint, there

9   is nothing in the complaint that makes any factual allegations

10  that my client had any access whatsoever to the underlying

11  code, to the underlying architecture or engineering, or that

12  my client copied anything.  There is no statement in there

13  that they know that he copied anything.  They go to great

14  lengths, both in the complaint and in the declarations, that

15  they provided to the Court, that there was this big

16  investigation that was done, into exactly what happened, key

17  strokes and all of this.  But what's missing from that is,

18  number one, any statements that show that Zuddl had access to

19  the underlying architecture and code; and number two, that

20  Zuddl copied anything.

21         So their entire claim boils down to our guys saw

22  exactly what the customer saw on the user interface.  That's

23  it.  Not that anything was copied.  It's also devoid of any

24  factual allegation that my client has incorporated or used any

25  of that information in any way, shape, or form except for the

─Cvent, Inc. V. Joyn Experiences─

18

1   allegation that my client poached CrowdStrike from them.

2   That's it.  That's the only thing that they are hanging their

3   hat on.

4          THE COURT:  I think I get your point.  I want to go

5   out of order a little bit.  How long is this YouTube video

6   that you want to show?

7          MR. BYERS:  They are actually fairly short, Your

8   Honor.  There are three of them and I think all total, if

9   memory serves, they are a total of, at most, 15 to 20 minutes

10  max.

11         THE COURT:  Okay.  The Court is going to go out of

12  order on the presentation of evidence because from what I

13  anticipate the witness for the plaintiff is going to testify

14  how this interfered with business.  I want to see what's out

15  there so I can compare and contrast what she says as to what's

16  out there.  So unless plaintiff has any objection, I would

17  like to see the video first and then put your witness on.

18         MS. CONSOLINO:  Thank you, Your Honor.  At some

19  point if I could have a few minutes to also respond to some of

20  his statements because I think --

21         THE COURT:  I'll let you do it on the back end.

22         MS. CONSOLINO:  Thank you.

23         THE COURT:  Okay.  Let's go ahead and play the

24  video.

25         MR. BYERS:  Yes, Your Honor.

─Cvent, Inc. V. Joyn Experiences─

19

1          Your Honor, the first video that I am going to show

2    the Court is seven minutes in length, and it's entitled

3    "Complete Splash Demo:  See Splash's Event Software in

4    Action."

5          MS. CONSOLINO:  Your Honor, excuse me, just --

6          THE COURT:  Hold up, Counsel.

7          MS. CONSOLINO:  To the extent that Your Honor might

8    have questions to our witness about the contents of the video,

9    we were wondering if we could bring her in so she could view

10   it as well.

11         THE COURT:  She some sort of expert witness?

12         MS. CONSOLINO:  She is partially a fact witness and

13   partially a non-retained expert.  She has expertise on the

14   platform.

15         MR. BYERS:  She was never identified as an expert.

16         THE COURT:  I think we're getting into some areas

17   that might be problematic.  The Court will review the video

18   and then if there are certain things that you want to have her

19   comment on, which are a part of the evidence that's being

20   presented, I'll let you ask questions about that.

21         MS. CONSOLINO:  Thank you, Your Honor.

22         THE COURT:  Okay.

23         MR. BYERS:  Your Honor, to that extent, if the Court

24   wants to allow, I'm more than happy to allow her to go through

25   the videos because --

─────Cvent, Inc. V. Joyn Experiences─────

20

1          THE COURT:  Well, let's not make double work.  Let's

2   go ahead and play the video for the Court.

3          (Video played.)

4          MR. BYERS:  I'm sorry, Your Honor.  Is the volume

5   okay on that?

6          THE COURT:  Oh, yeah.  We're good.

7          (Video played.)

8          MR. BYERS:  All right.  And I would like to point

9   out for the Court that at no point in that demonstration of

10  the entirety of the Splash platform and its functionality is

11  there any claim whatsoever that what the public is seeing is

12  claimed as a trade secret, copyright, or subject to any other

13  proprietary protection by Splash.

14         THE COURT:  I think the point that is being made,

15  though, is that while the concept of how this website works

16  is, in my view, nothing different than what you would see in a

17  wedding website.  It's the same thing.  You can punch around

18  and RSVP, you can buy presents, you can do all kinds of things

19  in the concept of the website.  But I think their point is

20  that if you take the guts as to how this thing actually works,

21  that would be, potentially, the violation of the trade secret.

22         MR. BYERS:  I would agree, Your Honor.  That if my

23  client were potentially CrowdStrike -- and to be clear, I do

24  not represent CrowdStrike and I can't make any representations

25  on behalf of CrowdStrike without violating Rule 11, which I'm

─Cvent, Inc. V. Joyn Experiences─

21

1    not going to do.

2          I understand the Court's point, and we agree that if

3    my client had beyond view access and could get into the

4    underlying coding and architecture that allowed the

5    functionality to function the way it does, that would be a

6    whole different matter, but that's not what we're talking

7    about here, Your Honor.  We are talking about, yes,

8    CrowdStrike may or may not had violated a Master Services

9    Agreement by setting up the account and walking through it

10   with my client.  The reason they did that was for

11   CrowdStrike's information and how CrowdStrike wanted it set up

12   so that they could set up their events and run them the way

13   they had been.  Nothing to do with copying what Splash had up

14   and copying their site.  As I said, the complaint and the

15   motion and the declarations are all devoid of any review or

16   comparison between what Splash is doing and what my client is

17   doing to show that there was any integration of any elements

18   whatsoever that they claim are protected into my client's

19   site.

20             THE COURT:  All right.  Let's see the next one.

21             MR. BYERS:  Yes, Your Honor.

22             This is -- this is Splash Designer Pro, part 1.

23             (Video played.)

24             MR. BYERS:  This is the introduction to part 2, Your

25   Honor.

─Cvent, Inc. V. Joyn Experiences─

22

1         (Video played.)

2         MR. BYERS:  Your Honor, I do not intend to ask the

3    Court to go through the entire series of training videos they

4    have posted for the Pro Series 1 and the Pro Series 2, but I

5    do have the exhibits showing the streaming of training videos

6    for each one of these series directly from their YouTube page.

7         MS. CONSOLINO:  Your Honor, I would like to object

8    to the admission of this exhibit.  These videos are from four

9    years ago.  It's entirely irrelevant to the platform today.

10         THE COURT:  It goes to weight.  Goes to weight.

11         MR. BYERS:  Your Honor, the burden beyond would be

12    on them to show that it is different and doesn't function the

13    same way, but.

14         Just so the Court is clear, the headers and footers

15    are on those printouts, Your Honor, so the specific page where

16    those videos appear is on the document itself.  The only other

17    point that I would like to make at this moment is to, number

18    one, reiterate that there are no allegations in the complaint,

19    the motion, or the declarations that my client had access to

20    anything other than what they've shown in the public.  They

21    didn't make any claims whatsoever that any of it was

22    proprietary or protected by trade secret or otherwise

23    protected.  There are no allegations in the complaint, the

24    motion, or the declarations that Zuddl used any of it for any

25    other purpose, except to, allegedly, poach CrowdStrike from

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─
EASTERN DISTRICT OF VIRGINIA

1    Splash.

2            The problem with that argument is is that Splash's

3    Master Services Agreement with CrowdStrike was ending.

4    CrowdStrike approached my client and told them that they

5    wanted to transfer over to their platform.  That's the only

6    reason it was demonstrated so that my client could get the

7    information specific to CrowdStrike.  Everything else is

8    publicly available, even though they try to hide it behind

9    this Master Services Agreement and claim trade secret in it.

10            THE COURT:  What's being suggested, though, is the

11    reason why this occurred is the motivation or motive to

12    actually poach the client, which is the basis for saying that

13    there's an infringement.  In other words, their theory, and

14    I'm not saying that I necessarily agree with it, but their

15    theory is that the reason why this information was accessed

16    illegitimately was to undermine a business relationship that

17    their client had with someone else.

18            MR. BYERS:  I understand that, Your Honor, but the

19    problem with it is is the timeline does not support that nor

20    do any of the allegations in their complaint support that.

21    They specifically state that CrowdStrike set up the account

22    and CrowdStrike brought my client in to demonstrate their

23    information and how they like the thing set up.  So it's

24    completely backwards from what they are trying to say.

25            As I said, over a third of the complaint are these

——————Cvent, Inc. V. Joyn Experiences——————

24

1    specific actions by CrowdStrike, not my client.  And as the

2    Court is well aware -- again, I'm not arguing on behalf of

3    CrowdStrike, but CrowdStrike can't interfere with their own

4    contract, and they only had a couple of months left in it.

5    They already decided they were going to transfer over, and so,

6    there was no contract to be interfered with.  There was no

7    information taken that didn't belong to CrowdStrike, because

8    the remainder of it was just viewing what was already

9    available in the public.  And Splash admits, in its complaint,

10   that -- and I can point the Court specifically to the part of

11   the complaint where it says it, but they admit that they were

12   involved in negotiations to enter a new Master Services

13   Agreement.  My -- I'm sorry CrowdStrike, according to their

14   complaint, made an offer to move forward with a certain number

15   of seats, certain number of users and Splash rejected it.

16   That's it.  So they can't even argue that they had any

17   expectation of an agreement going forward, because they

18   rejected it and there was no counteroffer.

19          So again, we're -- they are trying to -- they are

20   trying to convince the Court that my client went with the

21   intention of poaching CrowdStrike from their platform when all

22   of the allegations and all the facts that they've alleged,

23   show clearly that they understand that it was CrowdStrike that

24   initiated this, not my client.  And the only places in the

25   agreement are -- or in the complaint, or in the memo in

─Cvent, Inc. V. Joyn Experiences─
25

1    support of their motion, where they try to allege that my

2    client took and used the information for some nefarious

3    purpose, that it was incorporated into my client's -- my

4    client's platform and so on and so forth, is based upon

5    information and belief.

6            Now, they had the employee slash unidentified

7    expert, testify in her declaration that she did a deep dive

8    into exactly what happened during these interactions.  And

9    there's no allegation in it that my client took anything,

10    copied anything, made screenshots of anything, had access to

11    the underlying architecture or structure, and so, they are

12    trying to turn it on its head.

13            THE COURT:  I think at this point it is a good time

14    to hear from this witness.

15            MR. BYERS:  Understood, Your Honor.

16            THE COURT:  You can have the young lady step back

17    in.  Thank you.

18            MS. CONSOLINO:  Your Honor, whenever it's

19    convenient, I would like to address a few of the legal points.

20            THE COURT:  Sure.  Let's hear from the witness first

21    and then we lawyers can start talking to one another.  Come on

22    up, ma'am.

23    (KATHERINE ROLFE, Plaintiff's witness, was sworn.)

24            (Witness seated.)

25            THE COURT:  Ma'am, listen to the questions of

─────Cvent, Inc. V. Joyn Experiences─────

26

1   Counsel and answer them as best you can.  If you hear one of

2   the sides make an objection, please pause before answering the

3   question.

4            THE WITNESS:  Understood, thank you.

5            MS. MUELLER:  Good morning, Your Honor.  Good

6   morning, Ms. Rolfe.

7                    DIRECT EXAMINATION

8   BY MS. MUELLER:

9   Q.   Can you please state your full name for the record.

10  A.   Katherine Alexandria Rolfe.

11  Q.   And where are you currently employed?

12  A.   I am currently employed at Cvent based in Arizona.

13  Q.   And are you with a specific subsidiary or a division of

14  Cvent?

15  A.   Yes, Splash.

16  Q.   What is Splash?

17  A.   Splash is a small scaled event marketing software.

18  Q.   And what is your current job title?

19  A.   Manager of customer support.

20  Q.   And generally, what are your responsibilities as a

21  manager of customer support?

22  A.   Helping support my direct reports while supporting our

23  customers, whether that's through how-tos or in depth

24  investigations when the product is not working the way that it

25  should, and step in when a customer is escalated, or upset in

─Cvent, Inc. V. Joyn Experiences─

27

1    general about the way the product is working.

2    Q.    And in your role, are you familiar with the Splash

3    platform?

4    A.    Yes.

5    Q.    When did you first begin working at Splash?

6    A.    September 21, 2018.

7    Q.    And can you please provide a very brief overview for the

8    Court of your career trajectory at Splash?

9    A.    I started as a product consultant for Splash and was

10   later promoted to a team lead focusing on escalations for

11   customers specifically.  And then, in March of 2021, I was

12   promoted to my current role, manager, where I oversee the

13   team.

14   Q.    And in each of those roles, were you required to have an

15   in-depth knowledge of the Splash platform?

16   A.    Yes.

17   Q.    When was Splash acquired by Cvent?

18   A.    September 4, 2024.

19   Q.    And do you have an understanding of why Cvent acquired

20   Splash?

21   A.    Yes.

22   Q.    What is that?

23   A.    We target different type of events that our customers

24   host.  Cvent is more focused on those large scaled events

25   where Splash is really honed in on the small scaled event

─Cvent, Inc. V. Joyn Experiences─

28

1  programs.

2  Q.    And is that one of the things that make Splash

3  particularly unique?

4  A.    Yes.

5  Q.    Now, you previously described generally what Splash

6  itself is, very briefly, can you explain to us what the Splash

7  platform is?

8  A.    Yes.  The Splash platform is an end-to-end solution to

9  help event marketers host events from sending that first email

10  or sharing on social media, collecting information about the

11  guests, and also driving to a really beautiful-designed

12  website, and taking all of that information and making sure

13  that our customers are getting a return on investment for

14  using the product.

15  Q.    How many customers does Splash have?

16  A.    About 800.

17  Q.    And how does a customer gain access to the Splash

18  platform?

19  A.    So they would either work with our sales team and get

20  trial access, which is temporary access, typically under the

21  supervision of our sales team, or they purchase Splash through

22  a team license, and work with a technical implementation

23  specialist.

24         THE COURT:  How much does it cost to purchase

25  Splash?

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

Cvent, Inc. V. Joyn Experiences

29

1              THE WITNESS:  We're a user-based pricing model so it

2     depends on the user license.  There's two different kinds:

3     Host and builders.  So our low end is about 12,500 all the way

4     up to a million.

5              THE COURT:  So $12,500 up to a million for each

6     customer that decides to use the Cvent platforms?

7              THE WITNESS:  Yes, we do have some customers that

8     purchase multiple team licenses.  So I would say the 12,500 to

9     one million is a team license, but a larger customer like Meta

10    might have multiple of those.

11             THE COURT:  Is there a comparable or a competitor

12    that's out there that you all compete with as far as getting

13    this type of service provided?

14             THE WITNESS:  No.

15             THE COURT:  So you're the only ones who provide this

16    type of service that you're aware of?

17             THE WITNESS:  The end-to-end, yes.

18             THE COURT:  Very good.  Thank you.

19             MR. BYERS:  Your Honor, I'm going to object to the

20    majority of her testimony.  There is absolutely nothing in her

21    declaration that was presented to us in court that includes

22    any of this.  It's a short four paragraphs that has nothing to

23    do with the amount of sales, the number of customers, or

24    anything else.  So to the extent that it deviates from what

25    she has presented to us as testifying on, I'm going to object

─────Cvent, Inc. V. Joyn Experiences─────

30

1   to it.

2            THE COURT:  Overruled.

3            MS. MUELLER:  And I would just also note for the

4   record that Ms. Rolfe's declaration is a different

5   declaration.  It's quite -- it's like 15 or 20 pages long.

6   BY MS. MUELLER:

7   Q.   Once a corporate customer signs its contract with Splash,

8   and then you mentioned works with the Splash implementation

9   team to set up its account, how does the customer first gain

10  access to the Splash platform?

11  A.   The technical implementation specialist on the internal

12  Splash team will grant access to typically a day-to-day point

13  of contact and make them an admin, who can then add other

14  users DIY from that point forward.

15  Q.   So just to be clear, in order for a customer to gain

16  access to the full Splash platform, someone within the Splash

17  implementation team must initiate that admin account; is that

18  correct?

19  A.   Correct.

20  Q.   And then once that admin has the Splash account, how can

21  they invite additional users, employees of that company, to

22  have their own user accounts?

23  A.   So they have to navigate within the platform after

24  they've logged in to our team manager product.  So through

25  that workflow, they are required to add a user's email

─Cvent, Inc. V. Joyn Experiences─

31

1   address, and through that process they select a role for that

2   particular user, that role determines what type of access they

3   have, whether they can make certain types of edits, and then

4   they also assign them a group which determines the type of

5   events that they have access to.

6   Q.   Could a competitor, like Zuddl, come in and create its

7   own account and have access to the Splash platform?

8   A.   We do have a free offering.  We no longer allow free

9   signups as of May of 2025, but it's not the same level of

10  access that our paid customers have, and they don't follow the

11  same workflow because we don't offer the same --

12            THE COURT:  Why was this change in policy to not

13  have free accounts?

14            THE WITNESS:  I'm sorry.

15            THE COURT:  Why was there this change of policy not

16  to have free accounts for a limited time?

17            THE WITNESS:  It can cover two different parts.  One

18  was on the support side.  It was pretty expensive for us to

19  support users that were not paying for the platform.  And then

20  on the other side, is that we wanted to really focus our

21  product developments on our paid customers and we hadn't

22  touched our free tool in a long time so there were a lot of

23  parts of it that weren't working the way that it should have

24  been.

25            THE COURT:  Thank you.

─Cvent, Inc. V. Joyn Experiences─

32

1   BY MS. MUELLER:

2   Q.   Now, once an account admin invites a user at that company

3   to create an account, what does that user do if he or she

4   wants to then log in to Splash?

5   A.   So once the admin hits "add user" on that final page,

6   that new user will receive an email, what we call a team

7   invite email, that includes a link.  That user then has to

8   click that link and they are driven to a page where they have

9   to fill out their first name, last name, and generate a

10  password.  After that point, they are brought to another

11  screen to set up multifactor authentication for additional

12  security before accessing Splash.

13  Q.   And briefly, can you explain to the Court what

14  multifactor authentication is?

15  A.   It's an additional layer in addition to a password that

16  requires you to verify your account through a separate tool.

17  So those could be an authentication app, like, Goggle offers

18  one or in Outlook, or it could be a text message that sends

19  you a code, or even an email.

20  Q.   And does each user need to enter the password and go

21  through multifactor authentication each time that user

22  accesses the platform?

23  A.   Yes.

24  Q.   Are you familiar with CrowdStrike?

25  A.   Yes.

─────Cvent, Inc. V. Joyn Experiences─────

33

1   Q.   Very briefly what is CrowdStrike?

2   A.   CrowdStrike is a former customer of Splash.

3   Q.   And when did CrowdStrike first become a Splash customer?

4   A.   July of 2020.

5           THE COURT:  Was CrowdStrike ever a customer of

6   Cvent?

7           THE WITNESS:  I'm sorry.

8           THE COURT:  Was that company, the CrowdStrike, ever

9   a customer of Cvent?

10          THE WITNESS:  I don't believe so.  Cvent does use

11  CrowdStrike, though, so there is a relationship there.

12  BY MS. MUELLER:

13  Q.   And you mentioned that CrowdStrike is a former Splash

14  customer, when did they leave Splash as a customer?

15  A.   July of 2025.

16  Q.   And what happened?

17  A.   Through contract negotiations for their renewal they were

18  looking to contract, and through those conversations we found

19  that there was a breach in the contract, and we decided to not

20  move forward with the renewal at that time.

21  Q.   And when you said that CrowdStrike voiced that they

22  wanted to "contract," what does that mean?

23  A.   So like I mentioned we are a user-based platform so they

24  currently had 600 users roughly in the platform and wanted to

25  go down to six users in the platform to decrease their total

─────Cvent, Inc. V. Joyn Experiences─────
34

 1  spend on Splash.

 2  Q.   And that was from 600 to 6?

 3  A.   Yes.

 4  Q.   And you mentioned earlier that pricing is based on the

 5  number of licenses as well, correct?

 6  A.   User licenses, yes.

 7  Q.   And when did the renewal conversations with CrowdStrike

 8  begin?

 9  A.   May of 2025.

10  Q.   And before June of 2025, did you expect CrowdStrike to

11  renew its contract?

12  A.   Yes, I did.

13  Q.   Why?

14  A.   They are a long term Splash customer and a lot of their

15  users we actually consider Splash power users because they are

16  so in the weeds in what Splash does, and we actually lean on

17  them for product feedback too.

18  Q.   Now, without revealing the exact number approximately how

19  much annually was CrowdStrike paying for access to the Splash

20  platform?

21  A.   Over 250,000.

22  Q.   When CrowdStrike became a Splash customer, was there an

23  agreement in place?

24  A.   Yes, there was.

25  Q.   And did that agreement require confidentiality on

──── Cvent, Inc. V. Joyn Experiences ────

35

1   CrowdStrike's behalf?

2   A.   Yes.

3   Q.   And did that agreement prohibit customers from

4   unauthorized disclosures?

5   A.   Yes.

6   Q.   Now, we've already mentioned Zuddl.  Briefly, do you know

7   what Zuddl is?

8   A.   They are another event marketing software.

9   Q.   And are they a competitor to Splash?

10  A.   They've recently fallen into our competitor category,

11  yes.

12  Q.   And would a competitor like Zuddl typically have access

13  to the Splash platform?

14  A.   No.

15  Q.   How do you know that?

16  A.   Because they would have to gain access from another

17  customer and the only other way would be through the free tool

18  and we do monitor that based on their company domain that they

19  sign up with.

20  Q.   And when you say "the company domain they sign up with,"

21  can you explain for the Court what that means?

22  A.   Yes.  So every email has an @ and a domain.  So

23  @gmail.com is an example of a domain.  In this case, it would

24  have been @zuddl.com.

25  Q.   And so, if a free user tried to sign up with @zuddl.com,

─Cvent, Inc. V. Joyn Experiences─
36

1    would that flag anything within the splash system?

2    A.    Yes, we have a trigger that notifies our product team.

3    Q.    Did there come a time when you learned that Zuddl had

4    gained access to the Splash platform?

5    A.    Yes, on June 25, 2025.

6    Q.    That's when you learned?

7    A.    Yes.

8    Q.    And how did you learn that?

9    A.    I had the account manager for CrowdStrike send me a

10   message asking me to look into an anomaly in their user list.

11   CrowdStrike had explicitly only @CrowdStrike domains, but they

12   had one user that had a @gmail, and she wanted to understand

13   why that account was added, when it was added, and what kind

14   of access it had.  So I performed an investigation looking at

15   that particular user, just taking a couple of minutes prior to

16   that user being added to see what was happening, and that's

17   when I saw that a Zuddl team member had been added.

18   Q.    And so, I want to get into the details of what you just

19   said in just a moment.  But very quickly, you said that there

20   was only one gmail user on the entire CrowdStrike account.

21         Again, how many other users were there on the

22   CrowdStrike account?

23   A.    Roughly 600.

24   Q.    And all of those had what sort of domain names in their

25   username?

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─
EASTERN DISTRICT OF VIRGINIA

─────Cvent, Inc. V. Joyn Experiences─────

37

1    A.    @CrowdStrike.

2    Q.    And so, you mentioned that you learned through this

3    investigation that Zuddl gained access to Splash, how did

4    Zuddl gain that access?

5    A.    An admin for CrowdStrike, Teddy, went in and added,

6    following those steps I mentioned earlier, raj@Zuddl.com.

7    Q.    You mentioned "Teddy," is that Teddy Babanao?

8    A.    Yes, that is.

9    Q.    Who is Teddy Babanao?

10   A.    He's an event organizer for the event marketing team at

11   CrowdStrike.

12   Q.    And when Mr. Babanao invited this Zuddl user to the

13   Splash platform, what sort of access did Mr. Babanao himself

14   have?

15   A.    He had an admin license.

16   Q.    And what does that mean?

17   A.    It means he has the most available permissions that are

18   available to our customers in the platform.

19   Q.    Now, very briefly just so we can understand, were there

20   specific tools that you used in order to understand and see

21   exactly what Mr. Babanao did within the Splash platform?

22   A.    Yes.  I leveraged three tools:  Fullstory, Datadog, and

23   Heap.

24   Q.    And briefly can you describe what Fullstory shows you

25   when you do an investigation?

Cvent, Inc. V. Joyn Experiences

38

1    A.    Fullstory screen records what our users are doing while

2    they are logged in.  So it's as if I am sitting behind them

3    while they are performing actions in Splash.

4              THE COURT:  Is this in the nature of a monitoring

5    software that you use?

6              THE WITNESS:  Yes.

7              THE COURT:  Okay.  And does this monitoring software

8    have limited access?

9              THE WITNESS:  It is only available to certain team

10   members internally at Splash.

11             THE COURT:  Okay.  And does that include you?

12             THE WITNESS:  It does.

13             THE COURT:  How many other people have access to

14   those tools?

15             THE WITNESS:  I would say about 30.

16             THE COURT:  Do those individuals sign

17   confidentiality agreements?

18             THE WITNESS:  Through our terms of employment, yes.

19   We have several softwares that require that.  So it's pretty

20   genetic in the language.

21   BY MS. MUELLER:

22   Q.   And your ability to view screen recordings of what

23   Mr. Babanao did when he was logged in to the Splash platform,

24   those are not publicly available anywhere, right?

25   A.   No, they are not.

39

1   Q.   You mentioned two other tools, Datadog and Heap, what is

2   Datadog?

3   A.   Datadog is a logging software.  So as opposed to seeing

4   the actual actions, we get a log entry for every click or

5   action that's performed in Splash.

6   Q.   And you also mentioned Heap, what is Heap?

7   A.   Heap is a click tracker.  So every time your mouse

8   clicks, it tracks where the click was and what that click did.

9   Q.   Now, I understand that the account manager for

10  CrowdStrike had first asked you to look into the CrowdStrike

11  account after seeing this new user who was added.  Apart from

12  her, was there any other Splash employee who also had concerns

13  about what they were saying in the CrowdStrike account?

14  A.   Yes.  Every customer has an account team that includes

15  that account manager, as well as a customer success manager.

16  In this case, Sarah Fordham.

17  Q.   And what did Ms. Fordham notice?

18  A.   She initially noticed that there were event pages that

19  CrowdStrike had that included the name Zuddl.

20  Q.   And so, you mentioned event pages.  I would like to show

21  you a document so we can explain what an event page is.

22          THE COURT:  Counsel, because this is in the nature

23  of temporary injunctive relief, I'm going to give you about

24  ten more minutes to make your case.

25          MS. MUELLER:  In that case, let me go ahead and --

─Cvent, Inc. V. Joyn Experiences─

40

1   let me focus on a few key issues that we had questions about.

2   BY MS. MUELLER:

3   Q.   So you mentioned that you did see that there was

4   suspicious activity, is that fair to say, on Mr. Babanao's

5   account?

6   A.   What's your definition of "suspicious"?

7            THE COURT:  Use a different term.

8            Did you have some information to suggest to you that

9   that account had been compromised?

10           THE WITNESS:  In the true definition of the word

11  "compromise" the way that we do in tech, no, which would mean,

12  like, they were hacking into an account, but they did gain

13  access into CrowdStrike through proper channels.

14           THE COURT:  Okay.

15  BY MS. MUELLER:

16  Q.   Let me ask you this:  You conducted an investigation,

17  what did you discover as a result of your initial

18  investigation?

19  A.   Since it started with an account, bubby.raj@gmail.com, we

20  saw that that account was added as a viewer read-only.

21  Through that investigation, like I mentioned earlier, I wanted

22  to go back just to see what events happened prior.  Within

23  three minutes beforehand, Teddy, the same admin account, had

24  added another viewer read-only user that was raj@Zuddl.com and

25  had immediately deleted it before moving forward with a gmail

Cvent, Inc. V. Joyn Experiences

41

1  account that had initially caught our attention.

2  Q.   And so, when Mr. Babanao added raj@Zuddl.com and then

3  immediately deleted that and added bubby.raj@gmail.com, what

4  did that indicate to you?

5  A.   That they didn't want us to know that they had added a

6  raj@Zuddl.com email address.

7  Q.   And then, did that trigger you to conduct a deeper

8  investigation?

9  A.   Yes.

10  Q.   And what did you discover as part of that investigation?

11  A.   That it appeared as though Teddy was given a demo prior

12  to adding in these two users.

13  Q.   And when you say "a demo," what do you mean by that?

14  A.   So Teddy does have a history of being a Splash power

15  user, him in particular, for the CrowdStrike team.  So he

16  moves rather quickly in the tool rather that is us using these

17  investigations for other problems or just working with him on

18  that product feedback.  So while I was doing my investigation,

19  I noticed he was moving much slower than he normally had been,

20  and targeting certain areas of the platform with his mouse

21  just circling, underlining certain parts with his mouse, and

22  then taking moments to pause in-between, which is typical

23  behavior we see for demos.

24  Q.   And when you say "a demo" what exactly do you mean by a

25  demo?

Cvent, Inc. V. Joyn Experiences

42

1  A.  Showcasing different areas with a Splash product and

2  potentially the benefits to CrowdStrike.

3  Q.  And how could somebody demonstrate the Splash product on

4  their screen to someone else?

5  A.  It could be somebody sitting next to him or through a

6  virtual platform like Zoom or something like that sharing your

7  screen.

8  Q.  And so, I understand that you saw evidence in

9  Mr. Babanao's account that he was providing demonstrations to

10  Zuddl.  What specifically, when you started looking into

11  Mr. Babanao's account, did you see within his account?

12  A.  So as Sarah had already flagged for us, there were about

13  13 events that had Zuddl in the name of it.  So we started

14  looking at those ones to see that he was looking at the 13

15  different event types that CrowdStrike has.  Splash has out of

16  the box event types and we also offer custom event types to

17  our customers.  In this case, it looked like CrowdStrike had

18  actually created one per of those event types, aligned with a

19  specific theme, and orientation for each event program that

20  they look to be offering.

21  Q.  And so, you mentioned 13 different event types, are those

22  publicly available?

23  A.  No, these are specific to CrowdStrike.

24  Q.  And who created those 13 different event types that are

25  specific to CrowdStrike?

Cvent, Inc. V. Joyn Experiences

43

1    A.    A Splash internal employee.

2    Q.    And did your investigation indicate that CrowdStrike

3    demoed those 13 custom event types as well?

4    A.    Yes.

5            THE COURT:  How did you know that?

6            THE WITNESS:  Because they are -- for every event

7    page, there were a different event type and theme that

8    corresponded to the CrowdStrike program.  So they had, like,

9    one set as a security review and so that's a program that they

10   will host repeat events.  And then they had another one that

11   was like test events only.  So it wasn't part of their

12   integrations.  So each of those different events aligned with

13   each of those programs that we know CrowdStrike hosts.

14           THE COURT:  Two more questions.

15           MS. MUELLER:  Certainly.

16   BY MS. MUELLER:

17   Q.    So you were just talking about event types and that the

18   specific event types in the CrowdStrike account are not

19   publicly available but custom.

20           Now, are certain parts of the Splash platform

21   publicly available to be viewed or seen on either the Splash

22   website or otherwise?

23   A.    Yes, we have to market.

24   Q.    Are the parts of the Splash platform that Mr. Babanao

25   specifically demoed to Zuddl available publicly?

```
┌─ Cvent, Inc. V. Joyn Experiences ─────────────────────
│                                                      44
```

 1  A.   A lot of the parts, no.

 2  Q.   Can you explain what specifically is not publicly

 3  available that he demoed?

 4  A.   So the event types are the main source of that because

 5  that's what drives a lot of the scalability that Splash prides

 6  itself on.  In addition, it's some of those advanced admin

 7  features, like, managing users throughout the team, accessing

 8  different types of settings and integrations that CrowdStrike

 9  leverages.

10           MS. MUELLER:  Thank you.  I think that was my two

11  questions, Your Honor, so.

12           THE COURT:  Actually four, but I gave you a break.

13           MS. MUELLER:  Okay.  Certainly.

14           So you mentioned the --

15           THE COURT:  That doesn't mean you get more

16  questions.

17           MS. MUELLER:  Oh, okay.  Thank you, Your Honor.

18           THE COURT:  Yes, ma'am.

19                      CROSS-EXAMINATION

20  BY MR. BYERS:

21  Q.   Ma'am, I apologize.  I think I misheard you when you

22  stated your name.  You're Ms. Zugyer?

23  A.   No, my name is Katherine Rolfe or Kate Rolfe.

24  Q.   Very good.

25           So you testified that there was no admin access

─Cvent, Inc. V. Joyn Experiences─

45

1  given to whoever was using the Zuddl account, right?

2  A.   So the Zuddl account was never created.  It was just

3  added as a user then deleted.

4  Q.   Okay.  Now, let me make sure I understand this correctly.

5      When did CrowdStrike begin negotiations for a new

6  contract?

7  A.   May of 2025.

8  Q.   Okay.  When were the new accounts added?

9  A.   June 17th.

10  Q.   Okay.  So just to be clear, CrowdStrike had already

11  approached Splash to negotiate a new contract before any of

12  this other stuff happened?

13  A.   Splash approached CrowdStrike.  We always kick off the

14  renewal.

15  Q.   Okay.  Now, you also testified that CrowdStrike's

16  proposal was to reduce some 600 users to 6?

17  A.   Yes.

18  Q.   So can you explain why the complaint states that what

19  CrowdStrike wanted to do was reduce the number from 117 to

20  just 13.  And I'm specifically referring to page 8 and 9,

21  paragraph 30 that says, "Contract renewal negotiations

22  continued through June 2025.  Finally, on June 25th,

23  CrowdStrike informed Splash that it would not renew its

24  agreement with Splash under the terms the parties had operated

25  under for years.  Instead, CrowdStrike asked Splash to reduce

—Cvent, Inc. V. Joyn Experiences—

46

1   its number of paid user licenses from 117 to just 13."

2   A.    I'm not familiar with that.

3   Q.    Okay.  And remind me again exactly why was it that

4   CrowdStrike did not move forward with that new contract?

5   A.    We had chosen not to move forward with them.

6   Q.    Why?

7   A.    Due to them breaching the terms of the contract.

8   Q.    So going back to page 8 and 9, specifically on page 9 in

9   paragraph 30 of the complaint, it states specifically,

10  "Instead, CrowdStrike asked Splash to reduce its number of

11  paid user licenses from 117 to just 13.  Splash declined to

12  renew the agreement on those terms."

13          Can you explain the disparity?  There's nothing in

14  there that says that the reason that they were not going to

15  renew the agreement was because of the access that happened

16  after that?

17  A.    I'm sorry, what was the question?

18          THE COURT:  Rephrase your question.

19  BY MR. BYERS:

20  Q.    There's a discrepancy.  The complaint says that

21  CrowdStrike asked Splash to reduce the number of seats, number

22  of users from 117 to 13.  You had said 600 to 6, and that

23  Splash declined to renew the agreement on those terms.  Rather

24  than saying that Splash did not renew the agreement because of

25  the breach.

—Tonia M. Harris OCR-USDC/EDVA 703-646-1438—

EASTERN DISTRICT OF VIRGINIA

—Cvent, Inc. V. Joyn Experiences—

47

1  A.   I know on June 25th they had requested, but through

2  renewal negotiations it's typically a back and forth.  So the

3  25th was when I was asked to investigate and I believe that is

4  the same day they asked for that contraction.  They do have

5  pending users.  I'm not sure where the 175 is coming from or

6  117, excuse me.

7  Q.   So explain the difference between the admin access and

8  the view only access?

9  A.   They are on opposite ends of our roles and permissions.

10 So our admins have access to add users or manage groups or

11 change the permissions for those users.  Our viewer read-only

12 role only allows you to, exactly as it says, view areas of the

13 platform.

14 Q.   So Mr. -- and I apologize because I butcher his name

15 every time I try to say it, Mr. Babanao, I think is right.  So

16 Mr. Babanao had an admin account and the only type of account

17 that was set up for Zuddl to join in on those demonstrations

18 was a view account, right?  View only?

19 A.   Correct.

20 Q.   So how much access did Mr. Babanao have to the underlying

21 code and engineering architecture that drives the platform

22 used by users?

23 A.   He has access to the JavaScript and Customer Selector on

24 the event page design.

25 Q.   Okay.  So what does the JavaScript do?

─Cvent, Inc. V. Joyn Experiences─

48

1    A.    The JavaScript does a variety of things, because it can

2    be customized.  It could be collapsing an accordion block, it

3    could be rendering a video on page.

4    Q.    Okay.  Those are front end users, correct?

5    A.    Correct.  Both JS and CSS are both --

6          (Court reporter clarification.)

7    A.    Both JS and CSS, apologies, JavaScript, and Customer

8    Selector.

9    Q.    Okay.  So those are -- so those are functionalities that

10   drive the ability to add images and things like that, right?

11   A.    To an extent, yes.

12   Q.    Okay.  They don't have anything to do with the underlying

13   code and architecture of the platform itself, right, other

14   than that basic functionality?

15   A.    Not within Splash, but there are browser tools that make

16   that available.

17   Q.    All right.  So when you went and investigated this

18   access, you said that you used three tools?

19   A.    Correct.

20   Q.    Fullstory, Datadog, and Heap.  All right, so let's start

21   with Fullstory, please.

22          You said that it's basically the equivalent of you

23   standing over the user's shoulder and see everything that they

24   do.  So let me ask you a few things about that.  So if you're

25   using Fullstory to review what's happening on a site, and

─Cvent, Inc. V. Joyn Experiences─

49

1  somebody uses their pointer to highlight an image to say do a

2  Google search on, you'd see that, right?

3  A.   We won't see the Google search, we would see the

4  highlight within Splash.

5  Q.   You would see the highlight.

6        Would you see the copying of it?  If they right

7  click to say copy the image or whatever portion of it -- the

8  page they've identified, you'd see that, right?

9  A.   No, we would not.

10 Q.   But you would see it through Heap, right, which is the

11 click tracker?

12 A.   So when you "copy," that's a browser tool that is not a

13 Splash tool, so, no, we would not see that.

14 Q.   So you don't see everything that's going on?

15       THE COURT:  You can see the navigation, but you

16 can't see what they do with the navigation, is that fair?

17       THE WITNESS:  You can see anything that's done in

18 Splash.  As soon as it's, like, outside of the Splash world is

19 what we can't see.  So, like, when you right click and see all

20 those options, that's now your browser versus Splash.

21 BY MR. BYERS:

22 Q.   Okay.  So just to be clear, if there's an image on the

23 website, and just to be clear, Splash is a browser-based

24 product, correct?

25 A.   That is correct.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─Cvent, Inc. V. Joyn Experiences─

50

1  Q.   Okay.  So if a user was going to print any portion of it,

2  is there any of that that would appear that you could see?

3  A.   Not printing.

4  Q.   Is there any printing functionality in the platform?

5  A.   No, we don't print.

6  Q.   Okay.  Is there any copying functionality that you would

7  see?

8  A.   Yes.

9  Q.   Okay.  So if any of the information was copied during

10  those sessions, you would see that?

11  A.   Only in certain areas of the platform.

12  Q.   Okay.  But do you see any of that?

13  A.   Yes, on the event page design.

14  Q.   Okay.  What was copied?

15  A.   Different text elements.

16  Q.   And what are those text elements?

17  A.   In this particular case, it was a description of an

18  agenda for an event and an event description.

19  Q.   Okay.  So that's information that was entered by

20  CrowdStrike, right?

21  A.   That is correct.

22  Q.   Okay.  So you don't have any record of anything being

23  copied other than information regarding CrowdStrike, right?

24  A.   I'm sorry.  I don't understand the question.

25  Q.   Well, I'm asking you what was copied and it sounds to me,

Cvent, Inc. V. Joyn Experiences

51

1   correct me if I'm wrong, it sounds to me the only thing you

2   have a record of being copied was information that CrowdStrike

3   itself entered into the platform, right?

4   A.   Copied, yes.

5   Q.   Okay.  So just to be clear, you have no evidence

6   whatsoever that during these sessions that anything other than

7   CrowdStrike information that belonged to him was entered by

8   CrowdStrike was copied?

9   A.   Correct.

10          MS. MUELLER:  Objection.  I believe this is

11  misleading or using terminology different.  I just want to

12  make sure the record is clear.

13          THE COURT:  Well, it's cross-examination so he can

14  lead, but let's be a little bit more precise with the

15  questions.

16          MR. BYERS:  Understood, Your Honor.

17  BY MR. BYERS:

18  Q.   Once you identified this suspicious activity and there

19  are not direct allegations in the complaint, but there are

20  suggestions that my client took and copied elements of the --

21  what Splash is claiming is a unique platform.  They took and

22  copied elements of it and integrated that into what Zuddl is

23  doing.  Okay.

24          Did you ever compare Zuddl before and after to see

25  if there was anything from Splash that was integrated into

─Cvent, Inc. V. Joyn Experiences─

52

1    their platform?

2    A.    Not personally.

3    Q.    Okay.  Do you know if anybody did?

4    A.    I know our marketing team does in depth competitor

5    reviews.

6    Q.    Was that done on Zuddl's website after this information

7    about the -- alleged misuse by CrowdStrike occurred?

8    A.    I know we've done one for Zuddl.  I don't know where that

9    information went.

10   Q.    Okay.  Do you have any idea why it's not in the complaint

11   or in support of the motion?

12   A.    No.

13   Q.    All right.  So going back to the notice that there was an

14   issue, can you please remind me what it was -- what the issue

15   was that the account manager raised with you?

16   A.    Of the users that we have associated for CrowdStrike, all

17   of them leveraging at CrowdStrike.com, and the account manager

18   noticed that they had one user with an @gmail.com.

19   Q.    Do you have any other clients that use different emails

20   other than the company email?

21   A.    It's very --

22              MS. MUELLER:  Objection.

23              THE COURT:  Hold it.

24              THE WITNESS:  -- very rare, especially for a

25   security company like CrowdStrike.

─────Cvent, Inc. V. Joyn Experiences─────

53

1        THE COURT:  Hold it.  Overruled.  She answered the

2   question.

3        THE WITNESS:  Apologies.

4        THE COURT:  When you hear an objection, just wait

5   for a moment.

6        (Court reporter clarification.)

7        THE COURT:  Ma'am, if you could repeat your answer

8   so we can have it as part of the record.

9        THE WITNESS:  It's very rare, especially for a

10  security company like CrowdStrike.

11  BY MR. BYERS:

12  Q.   But it does occur?

13  A.   It's not occurred for CrowdStrike previously.

14  Q.   So at that point in time that you were alerted to what

15  was going on with CrowdStrike's account, was CrowdStrike's

16  account being monitored for any specific reason?

17  A.   We monitor all of our customer accounts.

18  Q.   Okay.  So if an email address shows up that's not what

19  they generally use in an user account, regardless of who it

20  is, does that automatically get reviewed?

21  A.   We do have internal triggers, but there's not always

22  manual action that's taken.

23  Q.   So it's case by case?

24  A.   Correct.

25  Q.   So why did it trigger the review in this case?

─Cvent, Inc. V. Joyn Experiences─
54

1   A.   Because the account manager had just had a conversation

2   about the accounts, so it was in there as they're reviewing

3   the users since they had just spoken about them.

4   Q.   Were they reviewing it because CrowdStrike was in

5   negotiations and it looked like was not going to be using your

6   company going forward?

7   A.   They had proposed continuing to use Splash just with a

8   lower number of users.

9   Q.   Okay.  Just to sum up, if you would, please.  So even

10  with admin access, somebody cannot access the underlying code,

11  or the architecture of the platform, correct?

12  A.   The code, no.

13  Q.   Okay.  And somebody with a reviewing only access can't

14  even see the JavaScript or anything like that, right?

15  A.   Correct.

16  Q.   Okay.  And there is some copying you can see and some

17  copying you can't see by using the data tools that you were

18  using?

19  A.   There are browser limitations, yes.

20  Q.   Did you see any copying by and through the view-only user

21  account?

22  A.   No.

23  Q.   So you saw copying of CrowdStrike's information by

24  CrowdStrike itself, but you didn't see any copying by the user

25  account that was set up for Zuddl, correct?

─Cvent, Inc. V. Joyn Experiences─

55

1   A.   To the best of my knowledge, again, there's browser

2   limitations, so I don't know what else would have gone on.

3   Q.   Did the copying accomplished by CrowdStrike occur on the

4   same dates and times as the alleged demonstrations?

5   A.   Yes, on June 17th.

6   Q.   During the same time frame?

7   A.   Yes.

8   Q.   Okay.  When you have a client who is on boarding new

9   employees, don't they go through and do training on the

10  platform?

11  A.   What do you mean by "training"?

12  Q.   Going through and showing a new employee the

13  functionality of how to set up events and things like that?

14  A.   Just to clarify, you're asking in the internal company or

15  through the Splash-available content?

16  Q.   Through the Splash-available content.  If a client is

17  bringing on a new employee who is going to be responsible in

18  part or in whole for setting up events and the like, they are

19  going to provide them with training on the platform, right?

20  A.   We would hope so.

21  Q.   Okay.  So was the behavior of what you saw with

22  CrowdStrike any different than training a new employee and

23  another client?

24  A.   Yes.

25  Q.   How so?

─── Cvent, Inc. V. Joyn Experiences ───

56

1   A.   The event types would be something an event organizer

2   would need to understand.  And so, underlining that on an

3   event overview and highlighting and circling that on the event

4   dashboard compared to all the other day-to-day features an

5   event organizer would need, is where that difference lays.

6   Q.   So it's going to be client specific?

7   A.   Typically our customers will look at what's available

8   within the product that our attendees would then see.

9   Q.   So there's no standard pattern to what these training

10  periods would look like?

11  A.   Right.

12  Q.   Okay.

13          MR. BYERS:  Your Honor, I don't have anything

14  further for the witness.

15          THE COURT:  I'll give you about 15 minutes.

16                     REDIRECT EXAMINATION

17  BY MS. MUELLER:

18  Q.   Now, Ms. Rolfe thank you so much for all of your answers

19  here today.

20          When Mr. Byers was asking you questions just now he

21  asked you when the renegotiation conversations began.  Do you

22  remember that?

23  A.   Yes.

24  Q.   And when did those begin?

25  A.   May.

Cvent, Inc. V. Joyn Experiences

57

1   Q.   When you conducted your investigation -- per your

2   investigation, when did Splash first begin demoing the Splash

3   platform -- I'm sorry, when did CrowdStrike first begin

4   demoing this Splash platform to Zuddl?

5   A.   We noticed it first on June 17th.

6   Q.   And were there event -- well, when were the first Zuddl

7   demo event pages created?

8   A.   March of 2025.

9   Q.   And did you see any indication that those event pages

10  that were created in March of 2025, were demoed to anyone?

11  A.   It demonstrated the same behavior of circling and

12  highlighting certain areas during the event creation process.

13  Q.   And that was months before the negotiations started?

14  A.   Correct.

15  Q.   And Mr. Byers also asked you a lot of questions about 117

16  to 17 versus 600 to 6 user contraction in the CrowdStrike

17  account.  Do you remember that?

18  A.   Yes.

19  Q.   And are there different types of user licenses?

20  A.   Yes.

21  Q.   Can you briefly explain the different types of licenses?

22  A.   So we had three licensed types and underneath those there

23  are some additional roles.  So we got our crew licenses, which

24  are those onsite specialists in the viewer read-only at no

25  cost to our users.  And then we got our host license, which

58

1   are, like, our event organizers, and then our builder

2   licenses, which are those advanced accesses where advance

3   design and admins live.

4   Q.   And did the Splash account in particular have a certain

5   number of the different types of licenses?

6   A.   I'm sorry, could you --

7   Q.   Did the Splash account have more of the free viewer

8   licenses than the paid builder licenses?

9   A.   No, the majority of the CrowdStrike users were host

10  licenses.

11  Q.   Host licenses?

12  A.   Yes.

13  Q.   But they were different types of licenses?

14  A.   Correct.

15  Q.   And could the different types of licenses help explain

16  the discrepancy between the two different numbers?

17  A.   No, that would come from if an account is pending or

18  they're actively logged in.

19  Q.   And so, did Splash have in its accounts or any users that

20  were pending?

21  A.   Yes.

22  Q.   Okay.  And do you have any idea approximately how many

23  pending users it had?

24  A.   I don't recall.

25  Q.   And Mr. Byers also asked you some questions about the

Cvent, Inc. V. Joyn Experiences

59

1   viewer-only access that bubby.raj was provided.  Do you

2   remember that?

3   A.    Yes.

4   Q.    And so, in terms of the viewer-only access, you said that

5   you explained there are some differences, correct?

6   A.    Differences compared to what?

7   Q.    Differences between the viewer account and like a host

8   account, for instance?

9   A.    Correct.

10  Q.    And can a viewer account be used to migrate data from the

11  Splash platform onto, for instance, the Zuddl platform?

12  A.    Theoretically they could, but they would have to rewrite

13  everything versus just downloading it like our other licenses

14  offer.

15  Q.    Can you explain how a different type of license, other

16  than a viewer license, would facilitate -- if you are a

17  customer and you just simply wanted to migrate your data to a

18  different platform, what sort of license would you use?

19  A.    The standard operations for a customers migrating are

20  typically an admin or a group manager, which have the ability

21  to access the reporting tab, which allows them to download

22  both event data and guest data.

23  Q.    And typically when a Splash customer wants to migrate

24  their data from Splash to some other platform, what do they

25  do?

─Cvent, Inc. V. Joyn Experiences─

60

1   A.   They download that data.

2   Q.   Did you see that happening in the CrowdStrike platform?

3   A.   I did not.

4   Q.   Now, Mr. Byers also asked you a lot of questions about

5   copying.  When you were answering those questions about

6   copying, did you understand him to mean or were you talking

7   about copying and pasting a specific block of text?

8   A.   We can only see text that is copied within Splash.

9   Q.   Right.  And so, separate from copying and pasting a

10  specific block of text, are there other ways that someone

11  could look at the Splash platform and then reverse engineer it

12  or try to take certain elements of it other than copying and

13  pasting text?

14  A.   Outside of Splash, yes.  There is a browser tool.  For

15  example, in Chrome it's called Inspect where it allows you to

16  see how a website is built just by right clicking and

17  accessing it.  We can't view that though.

18  Q.   In your tools if someone was even recording the screen,

19  as someone provided a demonstration, would you be able to see

20  that?

21  A.   No.

22  Q.   Okay.  And so, as these demonstrations were being

23  provided, what to you indicated that a competitor was going to

24  be able to not copy and paste the platform, but copy elements

25  of the platform or reverse engineer the platform?

─Cvent, Inc. V. Joyn Experiences─

61

1    A.    Some of the behavior I noticed that led me to that was

2    zooming in and out of certain areas.  Even just on the signup

3    form, these are zoomed in to look at what those fields looked

4    like and then on the various windows that followed that.

5    Q.    And so, you believe that these demonstrations were

6    concerned not because of copying and pasting but because of

7    the demonstration itself, is that fair to say?

8    A.    Yes.

9    Q.    And then Mr. Byers also asked you some questions about

10   any evidence that you have personally that Zuddl has actually

11   implemented any of the features of Splash.  Do you remember

12   that?

13   A.    I do.

14   Q.    Do you have access to Zuddl?

15   A.    I do not.

16   Q.    Do you know what the Zuddl platform looks like behind the

17   scenes?

18   A.    No, just our marketing website.

19   Q.    Now, Mr. Byers also asked you a few questions about

20   training and how a new customer who is coming on board might

21   be trained.  Do you remember that?

22   A.    Yes.

23   Q.    And when a new customer is on boarded before training,

24   are they required to agree to keep the platform confidential?

25   A.    Every user is required to confirm that they agree with

─── Cvent, Inc. V. Joyn Experiences ───

62

1  our terms and conditions and our privacy policy.

2  Q.   So before you can take that training would a user be then

3  required to agree to the confidentiality provision?

4  A.   Yes.

5  Q.   And is that also -- well, every employee who is brought

6  on board in Splash, does every employee also have to sign a

7  confidentiality provision?

8  A.   Splash employees have to sign the same one our customers

9  do as well as what's in our employee agreement.

10          MS. MUELLER:  Your Honor, if I may just have a

11  moment.

12          THE COURT:  Yes.

13          (Counsel confers.)

14          MS. MUELLER:  I have no further questions, but my

15  colleague would like time for argument.

16          THE COURT:  What we're going to do is take a

17  five-minute break, and then we're going to come back, and I'll

18  hear five minutes of argument.

19          MR. BYERS:  Your Honor, I would like a quick

20  follow-up with the witness before we're done here.

21          THE COURT:  Well, we don't typically do sur.

22          MR. BYERS:  Pardon?

23          THE COURT:  We don't typically do surrebuttal.

24          MR. BYERS:  I understand that, Your Honor, but she

25  had a new series of questions and answers that were not

─────Cvent, Inc. V. Joyn Experiences─────
63

1   raised --

2             THE COURT:  I guess from a practical standpoint you

3   could call her as your witness, so I'll let you have a little

4   bit of time, but it has to be a logical end to a request for

5   injunctive relief.  It is not your regular trial.

6             MR. BYERS:  Understood, Your Honor.

7             THE COURT:  We'll take a five-minute break.

8             (Recess.)

9             MR. BYERS:  Your Honor, if I may recall the witness.

10            THE COURT:  She's your witness.

11            MR. BYERS:  Very short.

12                         RECROSS-EXAMINATION

13  BY MR. BYERS:

14  Q.   Ms. Rolfe, one of the things that you said in your

15  testimony a few minutes ago was that one of the pieces of

16  information that is -- that is accessible is by using the

17  browser function to inspect the page, right?

18  A.   Correct.  That's the Chrome browser portion.

19  Q.   Okay.  What information is in there?

20  A.   Typically the network and console associated with how

21  that event -- or how any page works.

22            THE COURT:  And this is Google Chrome?

23            THE WITNESS:  Yes, that's correct.

24  BY MR. BYERS:

25  Q.   But that applies to any browser, right?

─Cvent, Inc. V. Joyn Experiences─

64

1   A.   And there is comparable options in other browsers, yes.

2   Q.   Okay.  Is there any way to block the Inspect function?

3   A.   No.

4   Q.   So anything -- any data that is obtained as a result of

5   viewing the -- inspecting a web page is available to the

6   general public?

7   A.   Not as a logged in Splash user.

8   Q.   I'm sorry what?

9   A.   Not as a logged in Splash user.  Like if you're logged in

10  and you use the Inspect tool that information isn't the same

11  as if you were to just go to the Splash main page.

12  Q.   It's the same?

13  A.   It's not.

14  Q.   It's not?

15  A.   Correct.

16  Q.   Okay.  But anybody -- any user that inspects the web page

17  is going to see the data, so you can't block it, you can't

18  hide it, you can't do anything to keep somebody from looking

19  at it, right?

20  A.   Correct.

21  Q.   Okay.  And I think you said that you could do that, but

22  none of it was copied?

23  A.   I can't see that.  It's a browser setting.

24  Q.   Okay.  So you have no idea whether or not any of that was

25  copied.

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

─────Cvent, Inc. V. Joyn Experiences─────

65

1          THE COURT:  Does typically Google Chrome allow you

2   to copy information from another platform?

3          THE WITNESS:  Yes, within the Inspector you can copy

4   anything from any event -- or any page that exist online.

5          THE COURT:  Even things that could be considered

6   secure measures or confidential in nature?

7          THE WITNESS:  Yes.  You can go even to the U.S.

8   district court website and do the same thing there.

9          THE COURT:  You didn't do that to me, did you?

10          THE WITNESS:  No, I did not.

11          MR. BYERS:  To be clear, Your Honor, I didn't

12   either.

13   BY MR. BYERS:

14   Q.   So let me follow-up on that really quickly.

15          Do you know whether or not the Splash platform

16   exists after being crawled on the site archive.org, also

17   referred to as the Wayback Machine?

18   A.   I'm not familiar.

19   Q.   You're not familiar with archive.org?

20   A.   No.

21   Q.   Okay.  So you don't have any idea whether or not I go to

22   archive.org and I look at the platform from a year-and-a-half

23   ago, if I can copy -- if I can run Inspect on it and copy the

24   information?

25   A.   You can run Inspect on any website.

———Cvent, Inc. V. Joyn Experiences———

66

1  Q.   Okay.  Let's assume, for the sake of argument, that I can

2  do that, right, I'm on archived sites, including the Splash

3  platform, that means that that information is available to the

4  general public regardless of whether or not they have an

5  account, right?

6  A.   I don't like to assume.

7  Q.   If I could get access to the inspection of historical

8  websites or historical pages of the Splash platform, and I can

9  inspect and copy that information then that means it's

10 available to anybody, right?

11         MS. MUELLER:  Objection.  This is asking the witness

12 to make an assumption about something that she already said

13 she has no knowledge of.

14         THE COURT:  Objection is speculation.  Sustained.

15         MR. BYERS:  Your Honor, I have no further questions.

16         THE COURT:  Ma'am, just a quick question for my

17 edification.  The reason why I'm asking is I'm trying to

18 learn.

19         I'm on the -- I'm on the technology committee for

20 the administration of the courts and you provided some very --

21 off the record.

22         (Discussion off the record.)

23         THE COURT:  You may step down, ma'am.  I'll hear

24 five minutes of argument from each side.

25         MS. CONSOLINO:  Thank you, Your Honor.  I just want

─Cvent, Inc. V. Joyn Experiences─

67

1    to address a few points that Mr. Byers made in argument.

2            First of all, I want to be very clear that he keeps

3    saying that there's no evidence that they use the information

4    except for the fact that they were able to login and poach

5    CrowdStrike, one of Splash's largest customers, that exception

6    aside, it is a truly red herring that we don't have any

7    evidence, of course we wouldn't be able to have that evidence

8    until discovery.  But the important part here is that the

9    trade secret statutes do allow the Court to enjoin threatened

10   misappropriation.

11           Threatened misappropriation, even if Zuddl has not

12   yet used or copied -- has not yet used Splash information in

13   its business, we know that misappropriation is likely for many

14   reasons.  Zuddl by its own admission is a competitor competing

15   for the same market share and customers at Zuddl for one

16   thing, and that is by itself enough to show threatened

17   misappropriation.  And I'm going to refer the Court to the

18   case cited in our brief, *Peraton v. Raytheon*, which addresses

19   that topic.

20           We don't have to show that they've already used it.

21   We just have to show that it's threatened and because they are

22   a competitor and they have had access to it, it is threatened,

23   and that's what that case stands for.  Critically, Mr. Byers

24   also admitted on two separate occasions that CrowdStrike gave

25   Zuddl a demonstration of how its events were set up, and that

68

1   is confidential proprietary protected Splash information that

2   is not public.  And he conceded that CrowdStrike gave Zuddl

3   access and Zuddl accessed that information.  So that is a very

4   important component of what they accessed that is a trade

5   secret and that is not public.

6        THE COURT:  At best, I think it could be described

7   and again this is not a final point on this, that at best it

8   appears that the evidence would suggest that if anything is

9   going wrong that Zuddl is a straw man for CrowdStrike.  And

10  so, if that is indeed the case, if we are going after the

11  straw man, why are we not going after the main infringer?

12       MS. CONSOLINO:  CrowdStrike is not a competitor.

13  Our concern is that a competitor like Zuddl is going to -- has

14  enough information to reverse engineer and then compete with

15  us, and they advertise on their website that they are a

16  competitor of CrowdStrike -- of Splash.

17       So Zuddl markets itself as a Splash alternative.  It

18  is on their website.  So what we want to prevent they have now

19  logged in with their view only access.  And Mr. Byers keep

20  saying oh it's only view-only access.  They can see everything

21  with view-only access.  With view-only access, they have now

22  gathered enough information that is not publicly available to

23  reverse engineer massive components of the Splash platform.

24       THE COURT:  A reasonable assessment of the evidence

25  at this point, again, let me take a closer look at it, is that

─────Cvent, Inc. V. Joyn Experiences─────

69

1    CrowdStrike wanted a better deal from your client reducing the

2    amount of users from, whether it's 600 or 117, down to a much

3    lower number.  But it seems that -- it could be suggested

4    reasonably that the information and the proprietary

5    information that you have is something that they are

6    interested in trying to keep, and maybe keeping it at a less

7    price.  And so, they have Zuddl go in and do all of these

8    things that you allege are inappropriate or infringing to

9    accomplish its objective.

10           How do we get to the real back end beneficiary of

11   this information if we don't make them a part of the

12   litigation?

13           MS. CONSOLINO:  Mr. Byers did not submit any

14   briefings.  I didn't have a chance to look at any case law on

15   what is required for a necessary party, but we are not

16   required to enjoin CrowdStrike from using our information,

17   because we can enjoin Zuddl from doing that.  Zuddl is a

18   competitor, not CrowdStrike.  And the reason why --

19           THE COURT:  But CrowdStrike is the beneficiary, you

20   would agree with that?

21           MS. CONSOLINO:  I would agree that they could be a

22   beneficiary, but the main beneficiary is Zuddl because they

23   accessed way more information than is strictly necessary just

24   to download the information that they would have needed to

25   transport a new customer.  What they accessed was information

─Cvent, Inc. V. Joyn Experiences─

70

1   that allows them to copy our platform and compete with us, and

2   that is information that we take extreme efforts to protect.

3   It is not publicly available, the designed architecture of the

4   platform is not publicly available, and we don't want our

5   competitors just to copy it, because that's our value.

6           THE COURT:  And you make a good point in the case

7   that you cite.  The Fourth Circuit case talks about the

8   confidentiality agreements, the monitoring software, and the

9   limited access, and your witness did a very good job

10  describing the steps that your client took to accomplish that

11  objective.

12          The struggle that the Court has right now is are we

13  focusing on the appropriate individuals or entities to seek

14  the relief that you're asking for?

15          MS. CONSOLINO:  I don't know that CrowdStrike has

16  misappropriated trade secrets.  I think Zuddl has

17  misappropriated trade secrets and a key component of the trade

18  secret statute is whether a competitor, and the case law talks

19  about this, threatens to use the trade secrets, and that's the

20  focus of our case.  CrowdStrike is not in this space.  They

21  are not going to reverse engineer our platform and compete

22  with us.  Zuddl will and Zuddl intends to.  And we are deeply

23  concerned, which is why we're here today that they have

24  deceptively used access through the -- through a customer to

25  gain vast access, much more than they would have needed.

Cvent, Inc. V. Joyn Experiences

71

1      THE COURT:  But if you disagree with the premise

2  that I just suggested -- and there's nothing wrong with doing

3  that, we're having a conversation.  If you disagree with the

4  premise that I'm suggesting that CrowdStrike is the actual

5  beneficiary of the Zuddl's actions, theoretically, why in the

6  context of your complaint, actually seeking relief originally

7  against CrowdStrike?

8      MS. CONSOLINO:  Well, we could enjoin CrowdStrike

9  from assisting them.  That is allowed under Rule 65.  The case

10  law does support that.  But now that -- the reason why that

11  changed is CrowdStrike is no longer a customer so they don't

12  have the same access that they used to so they can't assist

13  them.  That's why that changed.

14      THE COURT:  Okay.

15      MS. CONSOLINO:  And I would like to mention just one

16  more thing, Your Honor.  Zuddl has -- the case law is very

17  clear that all of this information, the entire platform, is a

18  trade secret and the fact that some of it might be publicly

19  available, it doesn't matter.  Courts have, time and time

20  again, rejected exactly the type of argument that Mr. Byers is

21  trying to make.  Well, this part is public and that part is

22  public.  It doesn't matter.  They did not have access to our

23  entire platform until -- and they repeatedly accessed over

24  many days:  June 17th, June 18th.  Several days of access

25  documented to our platform that they didn't have access to

─Cvent, Inc. V. Joyn Experiences─

72

1    until they surreptitiously logged in.

2            And to answer your question, the reason why Zuddl is

3    the beneficiary of this is because beyond just getting the

4    CrowdStrike as a customer, they are able to now replicate our

5    platform and they've seen things that we've never wanted them

6    to see and now they compete with us.

7            Cvent spent nine figures to acquire Splash, nine

8    figures for this platform.  That's it.  That's the entire

9    volume.  And now Zuddl has seen all of it.  That is a very

10   serious issue of concern for the future of our company,

11   because they are a competitor.

12           THE COURT:  I understand.  Thank you, Counsel.

13           MR. BYERS:  Your Honor, I fail to see how whether

14   it's $5, or $50 million, or $50 billion dollars why that has

15   anything to do with what we're talking about.  What they're

16   talking about is --

17           THE COURT:  They want to protect their asset.

18           MR. BYERS:  Pardon?

19           THE COURT:  They want to protect their asset.

20           MR. BYERS:  Well, sure, but it's the same argument

21   if they paid $250,000 for it.  Right?

22           What we're talking about here is we're talking about

23   an allegation, number one, that Splash has made no attempt

24   whatsoever to show the Court what was taken.  We don't have a

25   complete review and analysis.  They had a perfect opportunity

─────Cvent, Inc. V. Joyn Experiences─────

73

1   as an exhibit or exhibits to --

2          THE COURT:  But isn't there plenty of case law out

3   there that says that they don't necessarily have to have lost

4   what they're trying to enjoin from being taken?  In other

5   words, just a possibility of something that could be taken

6   could satisfy the requirements for injunctive relief?

7          MR. BYERS:  It could, Your Honor, but the problem

8   that they have is that they have not identified what it is

9   that is protectable.  During the course of this argument,

10  counsel for Splash has backtracked on 90 percent or more of

11  what they claimed in the complaint is protectable trade secret

12  information.  When the Court saw on the videos the use and

13  manipulation of the blocks, the setting up of events.  It's

14  very simple.  You go through the complaint, they've redacted a

15  bunch of that trying to impress upon the Court and us that

16  this is somehow trade secret when it shows up in their

17  training videos.

18          So they've already admitted to the Court that not

19  all that's protectable, and then they back up and they say

20  well, see it's the entirety of it.  All right.  The problem

21  with that is is that the training videos walk through the

22  entirety of it and show users how to use this functionality.

23  They have not explained to the Court why it is that there's

24  some structure, some magic structure that all of their

25  customers can see that they're not giving their customers the

─────Cvent, Inc. V. Joyn Experiences─────

74

1  training videos to use that functionality.

2          So where does the training come from.  I'm not aware

3  of any training and nor has -- not have they provided any

4  evidence of any training that is maintained as confidential

5  and trade secret.

6          THE COURT:  Let me ask you this, and I like

7  hypotheticals, because it helps me to think a little bit.  I'm

8  using my staff as part of the hypothetical.  Suppose

9  Ms. Armentrout here has a bank account and a bank account is

10 her bank account, she's nodding at me she's got lots of money

11 in this bank account, and she -- and I know she has a bank

12 account, and somehow I'm able to get into her bank account to

13 actually find maybe her bank account number.  But I don't have

14 her passwords, I don't have other things that are going to let

15 me access that account, I can't go through multifactor because

16 I don't know how she actually has it tipped off on

17 multifactor.  And so, she finds out that I have this

18 information, general information that I should not have, and

19 she says even though Alston has not taken any money out of my

20 account, I want to stop him right now before he does so,

21 because this is my information, and I know he has it, and I

22 can prove that he has it, and I want to stop him.

23          What is the difference between the theory of their

24 injunctive relief and that hypothetical?

25          MR. BYERS:  The difference, Your Honor, is that when

1   you're talking about a bank account, you're talking about a

2   completely different set of data that is subject to not trade

3   secret protection, not copyright protection, or any other

4   protections, it is subject to other statutes that provide

5   specific protection for financial data belonging to

6   individuals and companies.  That's different than this.  I

7   have an easier analogy for the Court.

8           What they are saying is, is that somebody provides a

9   service for whatever reason that you pay them and you go out

10  to a racetrack, and for whatever reason they agree they are

11  going to take a vehicle, and you're going to put your coffee

12  mug on top, and you're going to drive it around the track.

13  When they do it, they throw a tarp over the vehicle.  Now you

14  see them drive the mug around, right, so you see the entirety

15  of the functionality, but you don't see the engine driving

16  underneath.  You have no idea what kind of vehicle it is, you

17  have no idea how many wheels it has, you have no idea what

18  kind of engine it has, or any of that information.

19          The only thing my client saw, and by their own

20  admission, the only thing their clients can see is a tarp.

21  They can't get into the code, they can't get into the

22  architecture.  And so, first of all, the burden is on them to

23  show that what they are claiming is, as protectable, is a

24  trade secret.  They can't get around that.  They also can't

25  get around the fact that asking for this kind of injunctive

1  relief is an extraordinary remedy.  They cannot get around the

2  fact that the only thing they have ever claimed that my client

3  used any information for was to supposedly poach CrowdStrike,

4  but as the Court probably pointed out, it's CrowdStrike.  And

5  looking at their complaint, it's clear that they are pointing

6  the finger at CrowdStrike for giving access, and they can't

7  show that anything was copied other than information that's

8  owned by CrowdStrike, data entry by CrowdStrike.

9          Now, whether or not CrowdStrike breached the Master

10  Services Agreement by doing it or not, I can't argue more.

11  But, they can't show any harm.  They cannot show, by their own

12  admission, that our client has any information whatsoever that

13  can't be obtained through their training videos.  They have

14  not demonstrated to the Court that there's any possibility

15  that even the limited information that my client obtained,

16  would allow them to somehow reverse engineer it.  If my client

17  was going to reproduce what their website does, my client is

18  free to do that, but the underlying functionality my client

19  does not have access to and would have to, in essence,

20  reinvent the wheel, the underlying code and architecture would

21  have to be completely different, because they don't have

22  access to what makes their site function.

23          Now, there's two ways to protect something like this

24  outside of trade secret.  You can protect it via copyright,

25  how the image looks, the expression of the ideas on the

Cvent, Inc. V. Joyn Experiences

77

1    page --

2            THE COURT:  There's nothing suggested that it's been

3    copyrighted that I'm aware of.

4            MR. BYERS:  There is no suggestion.  There's also no

5    suggestion that they sought any kind of patent protection for

6    the underlying method.  I don't know if they have or not, but

7    there is certainly no allegation that that exist.

8            So there's also no notice on any of the videos that

9    anything of the functionality shown is subject to any -- any

10    protection whatsoever.  And so, they also have admitted

11    that -- and Ms. Rolfe admitted that my client's website is

12    monitored, that they have people in-house who have done this,

13    presumably to compare it to what Splash is doing.  And yet, we

14    don't have any of that information before the Court.  And I

15    can guarantee you the reason we don't have that information

16    before the Court is because it showed nothing.  Otherwise they

17    would be waiving it in front of the Court frantically.

18            So all they have is an allegation that maybe they

19    have something that's protectable that they can't parse out,

20    they claimed everything was a trade secret, until faced with

21    the fact that they put everything on YouTube for training, and

22    now has backed off of it, and said oh, well, it's only some of

23    it.  But that's not what they put in the complaint and that's

24    not what they listed in the complaint.  So they've got

25    significant problems and they have shown absolutely nothing

78

1    that would give any indication that my client has information

2    sufficient to build their website, no access to website

3    underneath the tarp, none.  None of their clients have it.

4    Doesn't have access to it.

5         My client's website is, obviously, being monitored

6    by them.  They have no evidence before the Court of any use of

7    it whatsoever, because there is no use, otherwise they would

8    be in front of the Court with that evidence as well.  The only

9    thing they have is an amorphous claim that somehow my client

10   used the information to poach a client from them.  That's it.

11   And they can't even quantize any potential harm or damage.

12   They haven't alleged that even if my client started doing some

13   of the same things they were doing on a platform, in terms of

14   how it looks and adding blocks and things like that, they

15   quantize what that harm may or may not be.  They are worried

16   about how much was paid to by the company.  Now, whether or

17   not that's tied to the value of the trade secret, I don't

18   know, because they haven't provided any testimony, any

19   evidence, no declarations to that effect.

20        And so, again, what we have is we have a situation

21   where they are asking the Court for an extraordinary remedy

22   that they can't show has any likelihood of occurring because

23   they can't show that what was taken, if it was taken, could be

24   used to reconstruct their site.  They can't show what on the

25   site may or may not be trade secret protected because all the

─Cvent, Inc. V. Joyn Experiences─

79

1    information that they posted is on training videos, and how to

2    use it, and all the functionality.

3            So the whole thing falls flat on the -- on whether

4    or not it's protectable trade secret information, and the

5    irreparable harm.  And on the irreparable harm prong, even if

6    my client did start to make their site look like the -- look

7    like theirs, that's not irreparable harm.  The Court awards

8    relief in cases like that all the time through monetary

9    awards, and in some cases punitive damages.  None of this is

10   something that cannot be rectified through the case, if it

11   were to occur in the first place.

12           THE COURT:  I think I understand your point.

13           What the Court is going to do is take the matter

14   under advisement.  I'm going to give each counsel an

15   opportunity to file a written brief.  No more than ten pages

16   outlining their positions in the matter post-hearing, and

17   we'll get you a decision as soon as practicable.

18           All right.  Very good.  Thank you.

19           MR. BYERS:  Thank you, Your Honor.

20

21           **(Proceedings adjourned at 12:11 p.m.)**

22

23

24

25

─Tonia M. Harris OCR-USDC/EDVA 703-646-1438─

EASTERN DISTRICT OF VIRGINIA

1              CERTIFICATE OF REPORTER

2

3         I, Tonia Harris, an Official Court Reporter for

4    the Eastern District of Virginia, do hereby certify that I

5    reported by machine shorthand, in my official capacity, the

6    proceedings had and testimony adduced upon the Motion

7    hearing in the case of the **CVENT, INC., and ONE CLIPBOARD,**

8    **LLC,** d/b/a SPLASH **versus JOYN EXPERIENCES, INC., d/b/a**

9    **ZUDDL,** Civil Action No.: 1:25-cv-1341, in said court on the

10   26th day of August, 2025.

11         I further certify that the foregoing 80 pages

12   constitute the official transcript of said proceedings, as

13   taken from my machine shorthand notes, my computer realtime

14   display, together with the backup tape recording of said

15   proceedings to the best of my ability.

16         In witness whereof, I have hereto subscribed my

17   name, this August 30, 2025.

18

19

20

21   _____
     *Tonia M Harris*
     Tonia M. Harris, RPR

22   Official Court Reporter

23

24

25

80